## THOMPSON v. VAN LEAR.

### Opinion delivered January 27, 1906.

1. INJUNCTION—RESTRAINING CRIMINAL PROCEEDING.—An injunction will not lie to restrain a certain prosecution from being conducted in the Federal court, when it should have been instituted in a State court, as the remedy by appeal is adequate. (Page 511.)

2. PHYSICIANS AND SURGEONS—VALIDITY OF ANTI-DRUMMING ACT.—Acts 1903, p. 342, forbidding physicians and surgeons engaged in the practice of medicine to solicit patients by paid agents, is a valid exercise of the State's police power in regulating the practice of medicine and surgery. (Page 512.)

Appeal from Garland Chancery Court; ALPHONZO CURL, Chancellor; reversed.

*Wood & Henderson, Greaves & Martin* and *Leland Leathman,* for appellants.

1. The act is not in conflict with the Constitution, either State or Federal. 39 'Ark. 357 and cases cited. See, also, 50 La. Ann. 1358; 58 L. R. A. 925; 79 Pac. 706; 159 Ind. 211; 54 N. E. 862; 59 L. R. A. 190; 113 U. S. 27. It provides for due process of law, affects all alike who are similarly situated, and is not invalid on account of injust discrimination. 79 Pac. and 113 U. S. *supra;* 101 Ind. 564; 73 N. E. 1063.

2. It is within the police power of the State to prohibit all things hurtful to society, and to promote its safety, comfort and welfare. 58 Am. Rep. 400; 137 U. S. 86; 18 Am. & Eng. Enc. Law, 818; 137 U. S. 784; 97 U. S. 501; 48 L. R. A. 775; 27 *Id.* 718; 67 *Id.* 938; 32 L. Ed. U. S. 253, 257; 30 *Id.* 229; 31 *Id.* 205; 67 L. R. A. 920; 1 Black (3 Ed.), § 126; *Id.* § 125. In matters affecting the public welfare the police power stands above private rights. 6 L. R. A. 613. The intendments of the State and Federal constitutions were to promote the public welfare. 65 L. R. A. 56 *et seq.; Id.* 424; 177 U. S. 183. The State in the exercise of its police power may regulate the practice of medicine and surgery, impose such reasonable restrictions thereon as it may deem advisable, revoke a physician's license, and define the qualifications of one who seeks to practice. 129 U. S. 114; 80 Pac. 544; 52 Ark. 228; 47 Ark. 562; 54 Cal. 94; 86 S. W. 1029; 10 Col. 387; 58 Am. Rep. 400; 78 Iowa, 12; *Id.* 321; 87 Iowa, 659; 66 Kans. 710; 93 Ky. 393; 16 Pick. (Mass.) 353; 70 Mich. 6; 12 Mont. 203; 10 Nev. 952; 49 'Pac. 952; 25 N. Y. 123; 10 Wend. 449; 52 Hun, 65; 4 N. Y. Supp. 495; 14 S. E. 42; 28 S. E. 517; 47 N. E. 1041; 29 Pac. 8; 31 Pac. Rep. 514; 5 Tex. App. 306; 39 Pac. 918; 18 Am. & Eng. Enc. Law, 749; Cooley on Const. Lim., 3 Ed. 745; 39 .Ark. 357; 21 L. Ed. U. S. 394; 94 U. S. 77; 17 Ga. 323; 67 Ill. 37; 113 Ind. 514; 63 Kan. 494; 50 N. E. 750; 22 Am. & Eng. Enc. Law, 584; 106 Iowa, 28; 34 Tex. 21; 109 Ind. 278; 112 Ill. 289; 68 Ill. 444; 123 U. S. 623; 136 U. S. 436; 137 U. S. 86; *Id.* 624; 169 U. S. 365; 191 U. S. 297; 197 U. S. 11; 42 L. Ed., 1002; 4 Wall. 277; 6 Tex. App. 202; 10 Wend. 449; 28 Pac. 643; 34 Am. Rep. 298; 170 U. S.

189; 105 Iowa, 529; 42 N. Y. 161; 25 Me. 104; 121 N. C. 643; 51 L. R. A. 719.

3. Acts of the Legislature are presumed to be valid until it is clearly shown that they violate some constitutional restriction. 65 L. R. A. 47; 11 Pet. 138; 191 U. S. 223; 40 L. Ed. U. S. 849; 11 Ark. 486; 174 U. S. 96; 3 R. I. 289; 94 U. S. 113; 6 L. Ed., U. S., 97; 118 U. S. 356; 4 Wheat. 316; 16 N. E. 193; Cooley on Const. Lim., 6 Ed. 220; Cooley, Const., 5 Ed. 187. Whether or not a statute is a reasonable one is a legislative question, and not judicial. 52 Ark. 232. If a state of facts could exist which would justify the legislation, it will be presumed that it did exist. 3 L. R. A. 295; 61 L. R. A. 613; 65 L. R. A. 428; 127 U. S. 678.

4. The act of the Legislature ceding to the United States exclusive jurisdiction of that part of the Hot Springs Reservation described in the act of Congress accepting the same and providing for rules and regulations, and the rules and regulations of the Interior Department over the same, are constitutional and valid. Kirby's Digest, § 3475; sec. 8, art. 1, Const. U. S.; 2 Mason, 60, 91; 6 Wheat. 422; 6 Ops. Atty. Gen. 577; 2 Wall. 526; 22 U. S. Stat. L., 121; 31 *Id.* 215; *Ib.* 907; 122 Fed. 518. See also 114 U. S. 525; *Ib.*, 542; 92 U. S. 698; 167 U. S. 518; 8 Wall. 533; sec. 3, art. 4, Const. U. S.; 106 U. S. 466; 144 U. S. 677; 82 U. S. 214.

*R. G. Davies,* for appellee.

The act is unconstitutional, because, after conviction, it prohibits a physician from practicing or offering to practice pending appeal from the judgment; because it denies trial by jury; because it violates secs. 2, 3, 17, 18 and 21, art. 2, Const. 1874; and 14th Amendment Const. U. S. See also 13 Ark. 262; 5 Ark. 359; 6 English (Ark.), 619; 39 Ark. 356. The practice of medicine is an ordinary, lawful and useful occupation, and to make it a crime to solicit custom for it is an unwarranted interference with constitutional rights. 34 Ark. 557. See also Herbert Spencer's Social Statics, 403, 404; 24 L. R. A. 68; 198 U. S. 45. The practice of medicine may be regulated, but cannot be suppressed. 64 Ark. 424.

The act of Congress is unconstitutional and void, (1)· because in conflict with the Constitution as to "the right of life, liberty and pursuit of happiness." 64 Ark. 424; 98 N. Y. 98; 97 U. S. 501; Am. Law Rev. Nov. and Dec. 1891; *Id.* Nov. and Dec. 1903; 16 Am. & Eng. Enc. Law, 1109; 133 N. C. 729. (2) Because it does not provide for due process of law. 5 App. Ct. (D. C.) 241; 11 Mont. 429; 125 Ill. 296; 187 Ill. 587; 97 U. S. 501; 38 Fed. 555; 10 Nev. 323; 129 U. S. 114; 11 Col. 523; 5 Sawyer, 553; 177 U. S. 188; 111 U. S. 391; 22 Fed. 701; 43 Ark. 32. No general powers to make needful regulations can include special rights to interfere with lawful business. 31 Ark. 464; 27 Ark. 467; 34 Ark. 553; 7 Cal. 164; 63 Cal. 21; 77 Cal. 166; 78 Cal. 141. See also 85 Cal. 274; 117 Ill. 294; 99 N. Y. 377; 33 W. Va. 188. (3) Because it is a bill of attainder—inflicts punishment without a judicial trial. 4 Wall. U. S. 277. See also 53 N. J. Eq. 101; 2 Q. B. Div. 333; 9 Atl. 559; 63 Fed. 321; 4 Wall. U. S. 277. (4) Because it deprives a defendant in a criminal case of the right of trial by jury. Act April 20, 1904, sec. 5; 7 Fed. 193 *et seq.;* 13 Fed. 413; 127 U. S. 450. (5) Because in conflict with sec. 8, art. 1, Const. U. S. The United States can not exercise exclusive jurisdiction over territory within a State only for a temporary purpose. 56 Fed. 630; 71 Fed. 550; 37 Wis. 379; 53 Wis. 65; 19 N. W. 782; 54 Fed. 604; Fed. Cas. No. 16,373; *Id.* No. 6312; 4 Dil. 380; 48 Fed. 669; 27 Fed. 616; 34 Fed. 86; *Id.* 729. (6) Because the law applies only to citizens within the State. 92 U. S. 220.

RIDDICK, J. This is an appeal from a judgment of the Garland Chancery Court enjoining the defendants, M. G. Thompson and others, from instituting any prosecution against the defendant, S. C. Van Lear, under the statute prohibiting physicians from soliciting patients through paid agents or drummers, and enjoining them from otherwise interfering with the business and practice of the plaintiff.

The facts are as follows: In 1903 the Legislature passed an act forbidding physicians and surgeons engaged in the practice of medicine to solicit patients by agents. Acts 1903, p. 342. Congress, which claims jurisdiction over a portion of the Hot Springs Reservation, has also provided by statute that physicians,

before prescribing the waters of the springs, shall be registered with the Superintendent of the Reservation, but that no physician shall be allowed to register who was engaged in soliciting patronage through the medium of paid agents.  Act of Congress of April 20, 1904, § 4.

To aid the officers of the law to enforce these provisions against the practice of soliciting patients by hired agents, a number of the physicians of Hot Springs formed an Association, called the "Visitors' Protective Association."  The meetings of this association were public, membership in it was open to all physicians of the city, and it was supported by the voluntary contributions of its members.  The chief purpose of the association, as before stated, was to aid in suppressing the practice among certain physicians of soliciting patients by hired agents or by "drumming," as it was called; the members of the association believing that this method of securing patronage was not only illegal and unprofessional, but that it was highly injurious both to the profession and the general public.  The efforts of the association to suppress this evil were not directed especially against plaintiff or any particular physician or school of medicine.  On the contrary, the agent or detective of the association, employed to look up evidence against physicians violating the statutes, was instructed to investigate and report to the officers of the law evidence against every physician who was guilty of such practice, without regard to who he was, or whether he was a member of the association or not.

The evidence shows that the plaintiff, Van Lear, was not permitted to register with the Superintendent of the Hot Springs Reservation as one of the physicians authorized to use the waters of the hot springs, or to prescribe the use thereof by his patients.  The reason for this refusal to permit the plaintiff to register was that he was suspected of having solicited patients by hired agents, though it was not shown that the defendants were responsible for this act of the Federal authorities.  But the agent of defendants employed to look up evidence against physicians, it seems, discovered evidence against Van Lear, tending to show that he was guilty of hiring agents to solicit patients for him, and that he was prescribing the waters of the springs to his patients without being registered, and he reported this evidence

to the officers, which resulted in prosecutions against Van Lear, and injury to his business as a physician. Van Lear thereupon brought this action in equity against M. G. Thompson and other members of the association to enjoin them from further prosecutions or interference with his business.

On the hearing the chancellor held that the law prohibiting physicians from soliciting patronage by hired agents was unconstitutional and void. He further held that the act of the State Legislature ceding jurisdiction to the United States over part of the Hot Springs Reservation was void on the ground that Congress had no authority to accept such jurisdiction, and that Congress could not legislate and make penal the act of a physician in prescribing the hot waters of the Reservation for his patients. This appeal brings his decision before us for review.

As to the jurisdiction of Congress over the Hot Springs Reservation and its right to enact laws regulating the use of the waters thereof by physicians, that of course presents a question on which this court would follow the decisions of the Federal Courts. But we do not find it necessary to decide that question in this case; for if the statute of the State Legislature prohibiting physicians from soliciting patients through paid agents be valid, it seems clear that the injunction ought not to have been granted in this case. For, if that was a valid statute, the purposes for which the defendants were associated were clearly legal. If soliciting patients by physicians through hired agents was unlawful, then this association was formed for the purpose of upholding the law and preventing its violation, and there would be no reason why an injunction should be granted, even if their agents made occasional mistakes and prosecuted innocent parties. The case would not be different if the act of Congress assuming jurisdiction over the reservation was invalid, for the State laws would then be in force there; and, as the purpose of the association was lawful, the fact that the agent of these defendants may have, when he found evidence against the plaintiff showing that he was guilty of violating the law, commenced the prosecution against him in the Federal instead of a State court would not justify the issuance of an injunction to stop such prosecutions, for the remedy of plaintiff at law in such a case was clear and adequate. He had nothing to do but to take

an appeal and be discharged, on showing that the law under which he was prosecuted in the Federal courts was invalid. *Taylor* v. *Pine Bluff,* 34 Ark. 603; In re *Sawyer,* 124 U. S. 200; *Davis & Farnum Mfg. Co.* v. *Los Angeles,* 189 U. S. 207; *Davis* v. *American Society,* 75 N. Y. 362; High on Injunctions, § 68.

So, as before stated, the main question is whether the State law is a valid law or not. Counsel for appellee has argued with much earnestness that laws of this kind are unwise, and he quotes from Herbert Spencer, who says in his *Social Statics* that there are no sound reasons why the principles of free trade should not be extended to medical advice and practice. The drift of the argument of Mr. Spencer can be understood from the following extract therefrom: "All measures which tend to put ignorance upon a par with wisdom inevitably check the growth of wisdom. Acts of parliament to save silly people from the evil which putting faith in empirics may entail on them do this, and are therefore bad. It is best to let the foolish man suffer the penalty of his foolishness. For the pain, he must bear it as he can; for the experience, he must treasure it up, and act more rationally in the future. To others as well as to himself will his case be a warning. And by multiplication of such warnings there can not fail to be generated a caution corresponding to the danger to be shunned." Social Statics, 205.

There is, no doubt, some truth in the assertion that it is not best for the law to give too much aid, for people should be taught self-reliance. But this argument is one that should be addressed to the Legislature, and not the courts. If followed to its logical end, it would result in allowing every one to practice medicine who wished to do so, and that is in effect what the author contends should be done. But, however well that may sound as a theoretical proposition, it does not work well in actual practice if we judge by the statutes of the different States, for there is hardly a State in the Union that does not regulate the practice of medicine by requiring some showing of qualification before a license to practice is granted. The tendency is towards raising the standard for admission to practice, rather than lowering it.

But, as before stated, those are questions for the Legislature. and not for the courts. The Legislature has acted in this mat-

·ter, and, whether the law be wise or foolish, the courts must enforce it if it be valid. Whether or not it is a valid law is the only question we can consider. The learned chancellor in a well-written opinion held that it was not a valid law, for the reason that in his judgment it was an unwarranted interference with the rights of physicians. But we are not able to concur in this conclusion. Under its police power the State has the right to prohibit things that are hurtful to the comfort, safety and welfare of society. It is now well settled that in the exercise of this power the State may regulate the practice of medicine and surgery. *Gosnell* v. *State,* 52 Ark. 228; *Richardson* v. *State,* 47 Ark. 562; *Dent* v. *West Va.,* 129 U. S. 114; *Hawker* v. *New York,* 170 U. S. 189; *State* v. *Edmunds,* 101 N. W. 431; Cooley's Const. Lim. 745; 22 Am. & Eng. Enc. Law (2 Ed.), 780. The law in question concerns the public health, over which the police power has the fullest sway; for, health being the *sine qua non* of all personal enjoyment, it is not only the right, but the duty, of the State to pass such laws as may be necessary for the preservation of the health of the people. 22 Am. & Eng. Enc. Law (2 Ed.), 922.

Counsel for plaintiff quotes Oliver Wendell Holmes as saying that "if the whole *materia medica* was sunk to the bottom of the sea, it would be all the better for mankind, and all the worse for the fishes." We do not dispute that statement, for there may be some truth in it, and it is possible that the Legislature had something of the kind in mind when it passed this act. It may have thought that people are too much inclined to imagine themselves in ill health, too prone to consult doctors, and take medicine anyway, without being urged to do so by hired agents. If it is true, as the "eminent medical authority" quoted by counsel says, "that out of twenty-four serious cases of disease three could not be cured by the best remedies, three others might be benefited, and the rest would get well anyway"—if this be true, is it not better, as a rule, to "throw physic to the dogs," and let Nature take her course? Now, it is probable that the conscientious physician would give that advice to his patient in a case where he needed no medicine. But it is not likely that a physician would hire an agent to drum up patients for him only to say to them: "Go thy way; thou dost not need a physician." A physician who has

33

secured a patient by means of a hired agent has paid out a certain sum to obtain his patient, and is under a strong temptation to put him through a course of treatment, whether he needs it or not, in order to get his money back and make a profit on his investment.    And therein lies a danger to the public from such a practice.    When a physician obtains patients in that way, he, in effect, buys them, just as if he said to the agent, "I will pay you a certain sum for every patient you send me," or "I will pay you a certain fee out of the money I receive from each patient you send me."    Now, we do not think prudent people would wish to submit to the advice of a physician who had paid out money to get them under his treatment.    To be successful, the agent would necessarily have to keep his interest in the transaction secret from the patient, and it can be easily seen that such a method of securing patients would very often result in imposition and fraud on the patient and in inducing many people to take treatment who did not need it.

As we have stated, even persons of good health are often too prone to imagine themselves in need of medicine.    If it is unsafe to allow such persons to be solicited by hired agents to take what they do not need, how much worse is it to expose the sick to such influences!    A man or woman who is laboring under a bodily disease is, other things being equal, more easily imposed upon than one who possesses a sound mind in a sound body. The mind of the sick man, like his body, is in an abnormal condition.    He is inclined to grasp at shadows and to pursue the wind, and is easily misled into paying money for medical treatment that he does not need.    The man who is induced by an agent to buy goods of a merchant can see the goods and judge of their quality before paying his money.    But the sick man must take the treatment for which he pays as a matter of faith.    As to whether he will be benefited or not, he can only conjecture.    He can only judge of the value of the treatment to which he submits by its subsequent results, and not even then with any great degree of accuracy, for the causes which lead to health or disease are often obscure.    They elude even the trained mind of the physician, and much more easily that of the patient.

The objections which we have stated to this method of securing patients, the temptations to which it would subject the

physician, and the danger to which it would expose the patient, show a wide distinction between the case of a merchant who drums for custom by hired agents and that of a physician who seeks patronage in the same way. The business of the physician directly affects the public health, and it does not follow, because the merchant, the manufacturer and others may solicit trade through hired agents, that a physician may do the same thing. The Legislature has forbidden the physician to do so, and there are, in our opinion, sound reasons upon which to base the distinction. The law thus undertakes to protect the physician from the temptation and the patients from the danger to which they would be exposed by such a practice. When we consider how easy it would be in many cases for the professional drummer to impose upon sick people, and even upon those who are well, and induce them to submit to treatment they do not need; when we consider that a physician who had paid for a patient would be under a strong temptation to make a profit out of his investment, and to give and charge for treatment whether the patient needed it or not; when we consider the fraud and imposition that would be encouraged by such a method of securing patients—we easily reach the conclusion that the law wisely prohibits a physician from seeking patronage by means of paid agents.

It seems to us to be a regulation clearly within the power of the Legislature to impose upon those who practice medicine, and that this statute is valid, at least to that extent.

As we are of the opinion that the defendants were acting under a valid law, it follows that they were engaged in a lawful undertaking, and that there were no grounds for an injunction against them. It is therefore unnecessary for us to consider whether, if the law had been invalid, an injunction should have been refused on the ground that there was an adequate remedy at law.

For the reason stated, we are of the opinion that the chancellor erred in granting the injunction. Judgment reversed, with an order to dismiss the complaint for want of equity.