[No. 7177.]

## CHENOWETH v. STATE BOARD OF MEDICAL EXAMINERS ET ALS.

`·` 1. CERTIORARI—*The Inquiry*, is limited to whether the court below exceeded its jurisdiction or greatly abused its discretion. (76)

2. POLICE POWER—*Extent of the Power*. The legislature may enact regulations for the examination and registration of those who would practice medicine. The only limit to the power is that the regulations prescribed shall be reasonable, and of this the courts must judge. (79)

The legislature has no power, under the guise of a police regulation to arbitrarily invade the personal rights and liberties of the individual citizen. (79)

Nor to confer upon a board of medical examiners authority to deny to a physician the right to advertise his business. (80)

3. STATE BOARD OF MEDICAL EXAMINERS—*Powers of the Board*. The statute authorizing the revocation of a physician's license for publishing an advertisement relative to any disease of the sexual organs (Rev. Stat. § 6068) is void for uncertainty, and in violation of the 14th amendment to the Federal Constitution and § 3 of our Bill of Rights. (86)

*Error to Denver District Court.*—Hon. GEO. W. ALLEN, Judge.

Mr. CHARLES L. DICKERSON and ROY E. DICKERSON, for plaintiff in error.

Mr. HARRY E. KELLY and Mr. CHARLES H. HAINES, for defendants in error. ·

Mr. JUSTICE SCOTT delivered the opinion of the court:

On the 15th day of March, 1906, a complaint was filed with the State Board of Medical Examiners charging M. S. Chenoweth, duly licensed to practice medicine under the

laws of the state, with publishing in the Rocky Mountain News, a newspaper published in the city of Denver, an advertisement relative to a disease, and diseases of the sexual organs. This was under section 6068, Revised Stat. 1908, authorizing the State Board of Medical Examiners to refuse to grant, or to revoke a license to practice medicine in this state upon the ground, among others given in the statute, of "causing the publication and circulation of an advertisement relative to any disease of the sexual organs."

The advertisements complained of are not set out in the complaint nor in the abstract of record, but there are newspaper clippings attached to the transcript of record which we assume to be the advertisements offered in evidence. A hearing was had on this complaint, by the State Board of Medical Examiners, and the license of Dr. Chenoweth revoked. A writ of certiorari was issued out of the District Court and upon a hearing before that court this writ was dismissed, from which ruling of the court the plaintiff in error brings the case here for review. The question as to whether certiorari is the proper remedy in this case is not raised or presented and we are not to be understood as passing upon that question.

The record discloses that the Medical Board preserved no testimony and we are left to the minutes of that body alone for information as to what occurred at the hearing upon the complaint filed. There were others tried at the same hearing, but other final disposition was made as to these cases, and the plaintiff in error alone, is now complaining.

The minutes of the board disclosed the presence of Dr. Chenoweth at the hearing, and his admission of responsibility for the publication by the Scott Medical

Company, and the Dr. Myers Medical Company, both of which companies he apparently controls. Also a resolution by the board revoking his license to practice medicine, because of the fact of such publications alone.

It has been held by this court that the inquiry upon certiorari is limited to whether the court below exceeded its jurisdiction or greatly abused its discretion.—*People v. District Court*, 22 Colo. 422, 45 Pac. 402. Also that the object of the proceeding is to correct errors of law apparent from admitted or established facts, and not to settle those which are disputed.—*Hallet v. Board of Co. Com.*, 27 Colo. 86, 59 Pac. 733.

Further, that in Colorado. there are two different proceedings by certiorari; one to review the action of an inferior tribunal or board of officers; the other to secure the trial *de novo* of causes previously heard by Justices of the Peace.—*Small v. Bischelberger*, 7 Colo. 563, 4 Pac. 1195.

The question then to be determined in this case is whether the Board of Medical Examiners was without jurisdiction, exceeded its jurisdiction, or greatly abused its discretion, and in this instance, is the statute, in so far as it relates to the particular ground for revocation, in violation of the constitutional rights of the plaintiff in error. There is no question but that the defendant caused the publication of the advertisements. There can be no reasonable question under the decisions of the courts of this state, and the law generally, but that under the police power inherent in the state, the legislature may enact reasonable regulations for the examination and registration of physicians in the practice of medicine and surgery, and that such statutes violate neither the Federal nor the state constitutions.

Neither does the authority of the legislature end with declaring what qualifications he who enters upon the practice of that profession shall possess. "As it has plenary power over the whole subject, it alone must be the judge of what is expedient, both as to the qualifications required, and as to the method of ascertaining such qualifications. The only limit to the legislative power in prescribing conditions as to the right to practice is that they shall be reasonable, and whether they are reasonable the courts must judge." 30 Cyc. 1547.

That the state may create a board of experts authorized to examine and grant such licenses, and to hear and determine any complaint made against any person holding a physicians' license, and in a proper case to revoke the same is equally well settled. It is also true that while the power of a board so created is in the nature of a quasi judicial power, yet it is not such a power as cannot be granted by the legislature. Therefore, the only limit of the legislature in this respect is that it shall provide reasonable regulation. But the right is one of regulation only, and must be found in the power of the state to provide for the general welfare of its people.

The power of the legislature however, is not such as may unreasonably interfere with the undoubted right of every citizen to follow any lawful calling, business, or profession, he may choose, subject only to reasonable regulation; for the right to labor and to receive the fruits of such labor is a natural and inherent right always protected by the constitution.

The statutory ground in this case is "causing the publication and circulation of an advertisement relative to any disease of the sexual organs." The only statute of similar import brought to our attention is that of Nebraska, 4327 Neb. Comp. Stat. In that statute however,

is found the qualifying words, "tending to injure the morals of the public." In the statute under consideration, the mere publication of the advertisement, regardless of its tendency, is sufficient to authorize the revocation of the license, and it must be presumed that the action of the board was based solely upon the fact of the publication, as it was authorized to do by the language of the statute. Under this statute then, no matter how harmless or innocent may be the publication, nor what may be the chasteness of its language, nor the utter absence of any tendency to injure the morals of the public, yet the very fact of the publication of the advertisement is sufficient to take from a physician his license and the right to practice his profession.

If this is to be justified under the statute then the very basis upon which rests such statutes of regulation must be ignored. For such legislation is justified only upon the ground of police power, and as tending to promote the public health, morals, safety or general welfare.

"The police power is limited to enactments which have reference to the public health or comfort, the safety or welfare of society. Laws which impose penalties on persons and interfere with the personal liberty of the citizen, cannot be constitutionally enacted, unless the public health, comfort, safety or welfare demands their enactment. It is for the legislature to determine when an exigency exists for the exercise of this power, but what are the subjects of its exercise is clearly a judicial question. The exercise of legislative discretion is not subject to review by the courts when measures adopted by the legislature are calculated to protect the public health, and secure the public comforts, safety or welfare; but the measure so adopted must have some relation to the ends thus specified."—(*Ritchie v. People,* 155 Ill. 98,

40 N. E. 454, 29 L. R. A. 79, 46 Am. St. 315).  The legis-
lature has no power, under the guise of police regula-
tions, to arbitrarily invade the personal rights and per-
sonal liberty of the individual citizen.  Its determination
upon this question is not final or conclusive.  If it pass
an act, ostensibly in the exercise of the police power, but
which in fact interferes unnecessarily with the personal
liberty of the citizen, the courts have a right to examine
the act and see whether it relates to the objects which
the exercise of the police power is designed to secure,
and whether it is appropriate for the promotion of such
objects.  When the police power is invoked for the pur-
pose of regulating a useful business or occupation, and
the mode in which that business may be carried on or
advertised, the legislature is not the exclusive judge as
to what is a reasonable and just restraint upon the con-
stitutional right of the citizen to pursue his calling, and
to exercise his own way, provided that he does not en-
croach upon the rights of others, cannot be taken away
from him by legislative enactment.—*Tiedeman on Lim.
of Police Power,* § 3; *In re Jacobs,* 98 N. Y. 108 [50
Am. Rep. 636]; *People v. Gillison,* [109 N. Y. 389,
17 N. E. 343, 4 Am. St. Rep. 465]; *Cooley on Const. Lim.*
[6th Ed.] pp. 606, 607, 744; *Ex parte Whitwell,* 98 Cal.
73, 32 Pac. 872 [19 L. R. A. 727, 35 Am. St. Rep. 152];
*Frorer v. People,* [141 Ill. 171, 31 N. E. 395, 16
L. R. A. 492]; *Town of Lake View v. Rose Hill Cemetery
Co.,* 70 Ill. 191 [22 Am. Rep. 71]; *Ritchie v. People,
supra; Ruhstrat v. People,* 185 Ill. 133, 57 N. E. 41, 49
L. R. A. 181, 76 Am. St. Rep. 30.

It is not material for the purpose of this case, to de-
termine whether the right to practice medicine be
classed as a property right, as contended by the plaintiff
in error, or as a mere privilege, as insisted by the board,

for it must be conceded that it is a valuable right. The right to practice medicine in respect to its value is no different from the right to practice law, and of this Mr. Justice Field said in *Ex Parte Wall*, 107 U. S. 265:

"To disbar an attorney is to inflict upon him a punishment of the severest character. He is admitted to the bar only after years of study. The profession may be to him the source of great emolument. If possessed of fair learning and ability he may reasonably expect to receive from his practice an income of several thousand dollars a year,—equal to that derived from a capital of one or more hundred thousand dollars. To disbar him having such a practice is equivalent to depriving him of this capital. It would often entail poverty upon himself, and destitution upon his family. Surely the tremendous power of inflicting such a punishment should never be permitted to be exercised unless absolutely necessary to protect the court and the public from one shown by the clearest legal proof to be unfit to be a member of an honorable profession."

Advertisements by physicians may be regarded by certain members of the profession, as contrary to professional ethics, but with that legislatures and courts may not be concerned. The legislature has no power to confer the authority upon a Board of Medical Examiners, to deny to a physician the right to advertise his business.

Many statutes relating to the powers and duties of boards of medical examiners fix as cause for the revocation of a physician's certificate to practice medicine, such as "unprofessional and dishonorable conduct," "grossly immoral and unprofessional conduct, etc." These statutes have been generally sustained by the courts.—*State v. Medical Board*, 32 Minn. 324, 20 N. W. 238, 50 Am.

Rep. 575; *Id.,* 34 Minn. 391, 26 N. W. 123; *Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247, 1 L. R. A. (N. S.) 811; *Meffert v. Packer,* 195 U. S. 625, 25 Sup. Ct. 790, 49 L. Ed. 350; *Arton v. Medical Board,* 114 Pac. 962; *State v. Board of Health,* 103 Mo. 22; *Kennedy v. Board,* 145 Mich. 241, 108 N. W. 730, 9 Ann. Cas. 125. But these cases sustain such statutes upon the ground of public welfare and public morals. For it is as essential that a licensed physician shall be possessed of professional honor, as that the applicant for such license shall possess such qualifications. In one of these cases cited by counsel for the board in this case, it was said:

"We will add, as our construction of the words 'unprofessional or dishonorable conduct,' as used in section 9, that we do not think that the legislature contemplated matters of merely professional ethics, but that the term 'unprofessional' was used convertibly with 'dishonorable.' The meaning may be expressed by using the conjunctive *and* in place of the disjunctive *or.—Wert v. Clutter,* 37 Ohio St. 347, 350; *Weston v. Loyhed,* 30 Minn. 221, 14 N. W. 892." And in *Meffert v. Medical Board, supra,* the court said: "It is subversive of the morals of the people and degrading to the medical profession for the state to clothe a grossly immoral man with authority to enter the homes of her citizens in the capacity of a physician."

Doubtless a physician might publish an advertisement which would in itself be so grossly immoral as to constitute dishonorable conduct. But our statute contains no such ground as a cause for revocation, neither is it contended or charged, that either of the publications complained of, were of any such character or had such tendency. The character of the advertisement is simply charged in the language of the statute as "relative to a disease of the sexual organs."

While we may not in this case enter into a consideration of the evidence, yet as illustrating the soundness of our conclusions, we note that the "Myers Medical Company," advertisement, and one for publication of which the license of Chenoweth was revoked upon the hearing, does not include the word "sexual" and contains no fairly inferred reference to a disease of the sexual organs. The only language in such advertisement that can be said to state or refer to any disease whatsoever is as follows:

"We treat and cure Catarrh and Stomach Troubles, Nervous Diseases, Kidney, Bladder Troubles, Heart Diseases, Diseases of the Stomach and Bowels, Piles, Fistula and Rectal Diseases, Female Complaints, Diseases of Women and Children, Rickets, Spinal Troubles, Skin Diseases, Deafness, Asthma, Bronchial and Lung Troubles, Consumption in the First Stages, Rheumatism, Hay Fever, Neuralgia, Hysteria, Eye and Ear Diseases, Goitre or Big Neck, La Grippe, Blood Diseases, Scrofula and all forms of Nervous and Chronic Diseases (that are curable)." Certainly there can be found nothing in this to justify the charge of an offense against the public morals. This but illustrates the settled principle of the law that such regulation statutes, to be justified, must be based upon the theory of protection of the public interest, the public morals or the public welfare.

The "Scott Medical Company" advertisement does not use the term "sexual organs," but in addition to the naming of diseases in no sense sexual, recites, "we successfully treat Weakness, Partial or Complete Loss, Lack of Power and Strength, complicated and Special Disorders of men only." These terms do not refer specifically to diseases of the sexual organs. They may possibly refer to resultant effects of diseases of the sexual organs,

but just as possible to be produced from other causes. Hence, to sustain the statute we must construe a publication relating to a condition which may or may not have been the resultant effect of a disease of the sexual organs, as being within its purview.

Then how can such an advertisement be reasonably said to injuriously effect the public morals? Such a contention is both prudish and absurd. We can but take notice of the trend of the times, and of the fact that societies and large numbers of respectable and moral people, including physicians, are urging that sex hygiene be taught in our public schools, in the interest of the public good and public morality. The statute does not provide that a tendency to injuriously effect the public morals or welfare, shall appear as an essential fact to be considered in connection with such an advertisement. Neither does the complaint so charge. All of this tends to convey the impression that the purpose of the provision under consideration was to enforce the ethical notions of some members of a profession, rather than for the protection of the public at large.

We must not be understood as in any sense declaring for the restriction of the exercise of the police power as heretofore announced by this court, in cases where the purposes are plainly for the public good, for it is the tendency of courts to make such new and other application of this doctrine, as the ever changing conditions and protection of society may seem to require. But there is a necessary limit to the invasion of the inherent and constitutional rights of the citizen, beyond which legislative restriction may not go, if stable government is to remain.

"In *Powell v. Pennsylvania*, 127 U. S. 678, 32 L. Ed. 253, 8 Sup. Ct. 992, 1257, the general proposition, that the enjoyment by the citizen, upon terms of equality

with all others in similar circumstances, of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding and selling property, is a general part of his right to liberty and property as guaranteed by the fourteenth amendment, was assented to by the Supreme Court of the United States, as embodying a sound principle of constitutional law. In the latter case, it was also held, that, although the power and discretion which a State Legislature has in the matter of promoting the general welfare and of employing means to that end are very large, yet such power must be so exercised as not to impair the fundamental rights of life, liberty, and property."—*Ruhstrat v. The People*, 185 Ill. 133, 57 N. E. 41, 49 L. R. A. 181, 76 Am. St. 30.

The expression in the constitution, "Life, liberty and the pursuit of happiness," is general in character, and includes many rights which are inherent and inalienable. Many of the rights referred to in this expression are included in the general guaranty of "liberty." The happiness here referred to may consist in many things, or depend on many circumstances, but unquestionably includes the right of the citizen to follow his individual preference in the choice of occupation.—Black on Const. Law 404. For these reasons we must conclude that the provisions of the statute that a physician's license may be revoked for "causing the publication and circulation of an advertisement relative to any disease of the sexual organs," is in violation of the fourteenth amendment to the constitution and sec. 3 art. 11 of our own Bill of Rights; "That all persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; and of seeking and obtaining their

safety and happiness." The State Medical Board may act only within its statutory authority, and such provision of the statute being invalid, the acts of the board in this case were void.

The plaintiff in error contends also that the term "relating to a disease of the sexual organs" as used in the statute, is so indefinite and uncertain as to make the statute inoperative and invalid for that reason. The question naturally arises as to what we are to understand by the term "diseases of the sexual organs." To what authority are we to turn for a definition? Does this term have a common or well understood meaning, and if not, what authority are we to seek for a definition. Suppose that by such a statute the publication of an advertisement relating to a disease of the sexual organs was declared to be a public offense, and that thereby others than physicians might be amenable to such a penal law, which by the way is not the case, and for that reason it is likewise contended that the provision in the statute is class legislation, and for such reason void; and suppose that it became necessary for the court in a given case, to charge the jury as to what constitutes a "disease of the sexual organs." If the court turned to the statute he would find no definition as in case of murder, arson, larceny, etc. If he were to search law dictionaries and law text books he would be equally in the dark as to a definition of the term. If he were to examine Webster he would find no such expression, yet he must define this alleged wrongful thing to which the offensive publication relates, in order that the jury may have some notion as to whether or not the accused is guilty of committing the offense. Having exhausted lexicographers, law writers and court decisions without avail, he can have recourse only to his common knowledge and the definition of the

words considered separately. He may have a very clear notion as to what the word "disease" means, but he cannot conceive that the use of this word, or of the specific names by which the multitude of diseases are known, the use of which names are so necessary to science and to the use of physicians and laymen alike, can be under any circumstances inherently harmful, or by law made so. If he considers the word "sexual," he finds that this is defined "as relating to sex," and that it includes both sexes. If he proceeds so far as to assume that such diseases arise solely from immoral acts, he must make additional unreasonable assumption. He must assume that the advertisement relates to a disease which is the result of immoral acts, else a mere publication relating to it, may not within the range of reason, be designated an offense.

Will it be said that more than a comparatively fair proportion of the diseases of sexual organs are the result of immorality? What will be said of tuberculosis, tumors, cancerous and other growths constituting diseases which effect every part of the human system. It is perhaps true that venereal diseases may be definitely said to be those arising from immorality, but who will have the hardihood to say that all sexual diseases are necessarily venereal diseases.

Will a court of justice sustain a conviction for an offense so abstractly named, so wholly undefined and so uncertain of definition, yet we are asked to sustain such a statute to the extent that a physician who may be charged with its violation is to be denied the right to practice his profession. Clearly, the statute is so indefinite as to render it invalid for that reason alone.

Beside, the penalty provided is so grossly excessive and unconscionable as to make the statute repugnant to

every sense of justice if not to render it void for such reason.

Under its provision a physician who has spent many years and vast sums of money to qualify himself to practice medicine, who has spent many more years in the practice, and thereby established a reputation and a practice worth thousands of dollars to him annually, and yet if he shall publish an advertisement relating to a disease of the sexual organs, however humane may be the purpose, and however innocent of wrong may be the intent, he must have all this taken from him, and have the consequent ignominy and contempt heaped upon him in addition. And in his trial for the alleged offense he is to be denied the privilege of a hearing before a court of justice and the right of trial by jury. He may not have the same right that is accorded to ordinary offenders. The statute provides that ''causing the publication of an advertisement relating to the sexual organs'' shall be an offense only if by physicians. Any person other than a physician may publish such advertisements at will. If such publication tends to injuriously effect the public morals it is not by reason of the fact that the publication is caused by a physician. The effect is precisely the same whoever may be the publisher.

The offense, if it be one, is a public one, equally applicable to all persons. At the time of the action of the state board in this case, there was no statute making such publication an offense as against others than physicians. The statute under consideration makes the act an offense only when committed by a physician, and for such reason is clearly discriminatory in that it applies to a class of citizens only, and for such reason alone was void.

The writer of this opinion speaking for himself, is of the opinion that in the interest of justice and fairness, the legislature might well provide for the right of appeal in such case, to the courts, where such a matter may be finally determined on its merits, as are other rights of citizens. Arbitrary and star chamber proceedings are abhorent to the American mind. There is no sane reason why a physician once found to be qualified in all respects to practice his profession, should not be permitted to have his rights ultimately and finally determined by a court of justice.

The judgment of the trial court is reversed and the case remanded with instructions to enter judgment directing the State Board of Medical Examiners to cancel its order revoking the license of the plaintiff in error to practice medicine in the state of Colorado, and to restore to him such rights and privileges in the premises as he may have been entitled to prior to such act of revocation.

*En banc.*

MUSSER, C. J., CARRIGUES J. and WHITE J. concur.

BAILEY J., GABBERT J. and HILL J. dissent.

Mr. JUSTICE GABBERT dissenting:

The police power of the state may always be exercised to protect the public morals, and its exercise of this power is valid when regulations of this character tend to accomplish the purposes for which they were enacted. The statute under consideration provides that the State Board of Medical Examiners may refuse to grant or may revoke a license to practice medicine in this state for sev-

eral causes, among which is, "causing the publication and circulation of an advertisement relative to any disease of the sexual organs." One purpose of these regulations, and the only one necessary to consider, is to protect the public morals, by prohibiting alleged physicians who have obtained a license to practice, from publishing and circulating advertisements of a nature that would tend to injuriously affect the morals of the community where the inhibited advertisements might be circulated and read. It needs no argument to demonstrate that advertisements of the kind prohibited are unfit to find their way into homes through the medium of the press, and that to the youth of either sex, at least, they are demoralizing. It is, therefore, apparent that the clause of the act in question which is under consideration, is a valid exercise of the police power of the state. It is also clear, if that question is before us, that the advertisements which the doctor caused to be published fall within its inhibition, for the reason that they unquestionably relate to diseases of the sexual organs, and refer to that class of diseases in as unmistakable terms as though the words "sexual organs" appeared in the advertisements.

The judgment of the district court should be affirmed.

The writer is authorized to state that Mr. JUSTICE HILL and Mr. JUSTICE BAILEY concur in this opinion.