## Reynolds v. Walz et al.

May 12, 1939.

JOSEPH SOLINGER for appellant.

HUBERT MEREDITH, Attorney General, WILLIAM H. HAYES, Assistant Attorney General, and CURTIS & CURTIS for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and plaintiff below, F. F. Reynolds, is

a practicing dentist located in Louisville, Kentucky. Our General Assembly at its regular 1938 session enacted chapter 148, page 722, of the session acts for that year, and which is now Section 2636-1 et seq. of the April, 1939, Supplement to Baldwin's 1936 Revision of Carroll's Kentucky Statutes. The 1938 Act repealed, amended and re-enacted prior statutes relating to and regulating the practice of dentistry in this Commonwealth and it will hereafter be referred to as "the amendment." Section 7 of the amendment (now Section 2636-6a in the supplement supra) prescribes for the revoking of licenses to practice dentistry in this commonwealth by the Kentucky State Board of Dental Examiners, which is, together with its members, the defendants and appellees in this case. Subdivision C of subsection (2) of the section referred to in the amendment defines unprofessional conduct for which the Board of Dental Examiners may revoke the license of a member of the profession to practice therein. Many activities and engagements are therein prescribed as constituting such unprofessional conduct—one of which is "advertising credit or terms of credit," extended by the practitioner to his patrons.

Plaintiff filed this declaratory judgment action against defendants in the Jefferson circuit court, in which he attacks the validity of and the right of the legislature to prescribe for the inhibition of "advertising credit or terms of credit" as unprofessional conduct—upon the ground, as stated in the petition, "that to prohibit this practitioner of dentistry to advertise credit or terms of credit is a violation of his constitutional rights both as to the Consttution of Kentucky, Bill of Rights, Sections 1, 8, and 13, and as to the Constitution of the United States, Amendment 14, Section 1 [U. S. C. A.]." Defendants interposed a demurrer to plaintiff's petition, and the Hon. Richard Priest Dietzman, sitting as Special Judge in the case, sustained it, followed by a dismissal of the petition after plaintiff declined to plead further, and from that judgment he prosecutes this appeal.

The learned judge prepared and filed a short opinion which has been made a part of the record brought to this court and which, though short, is most convincing and with which we coincide. We feel that we can not begin the discussion of the legal issue more appropriately than to insert it as a part of this opinion. It says:

"This case involves the constitutionality of Subsection C [of subsection 2] of Section 2636-6a of the 1938 Supplement to Carroll's Kentucky Statutes in so far as it prohibits dentists from advertising credit or terms of credit. On the argument it was conceded, as indeed it must be conceded, that the profession of dentistry and its practice is subject to the police power of the state and that the Section of the Statutes here under attack was enacted under that police power. It was further conceded in argument, as again indeed it must be, that in the exercise of the police power, the legislature must act reasonably and its regulations must have some reference to the public health, morals, safety or general welfare. Therefore, the only question for decision is, whether or not the attacked section reasonably affected or promotes public health, morals, safety or general welfare.

"It must be remembered that we are dealing with a profession and not a commercial business. We must further remember that in prescribing regulations for a profession different considerations apply than those where a purely commercial business is involved. The practice of dentistry, whatever its status in the past may have been when even barbers acted as surgeons, whence the barber pole, has risen long since to the dignity, and is essentially one phase of, the medical profession. Indeed, in the best dental schools today the first year of the work is the same as that of the first year in the medical schools proper.

"All dentists as well as all surgeons and members of the other professions are not of equal capacity and the selection of the particular professional man to treat or represent the individual may, in my judgment, under the police power of the state, be regulated by considerations other than those purely economical. If this be true, then clearly it was within the province of the Legislature to forbid the attempt to influence the public generally in the selection of a dentist through the media of advertisements of credit and credit terms.

"Further, the matter of credit and credit terms in the very nature of things would be appealing to people of modest means and to that class of the public which Legislatures have from time to time sought to protect in the matter of installment buying. Such protection has been universally upheld under the exercise of police

power. The principles herein set out are the same as those which support the decision of the Supreme Court in the case of Semler v. Oregon State Board of Dental Examiners, 294 U. S. 608, 55 S. Ct. 570 [572], 79 L. Ed. 1086. We quote from that opinion:

"'We do not doubt the authority of the state to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding differing standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the "ethics" of the profession is but the consensus of expert opinion as to the necessity of such standards.

"'It is no answer to say, as regards appellant's claim of right to advertise his "professional superiority" or his "performance of professional services in a superior manner," that he is telling the truth. In framing its policy the legislature was not bound to provide for determinations of the relative proficiency of particular practitioners. The legislature was entitled to consider the general effects of the practices which it described, and if these effects were injurious in facilitating unwarranted and misleading claims, to counteract them by a general rule even though in particular instances there might be no actual deception or misstatement. Booth v. Illinois, 184 U. S. 425, 429, 22 S. Ct. 425, 46 L. Ed. 623 [626]; Purity Extract & Tonic Company v. Lynch, 226 U. S. 192, 201, 33 S. Ct. 44, 57 L. Ed. 184, 187; Hebe Company v. Shaw, 248 U. S. 297, 303, 39 S. Ct. 125, 63 L. Ed. 255 [258]; Pierce Oil Corporation v. Hope, 248 U. S. 498, 500 [63 L. Ed. 381, 382, 39 S. Ct. 172]; Euclid, Ohio v. Ambler Realty Company, 272 U. S. 365, 388, 398, 71 L. Ed. 303 [301, 311], 47 S. Ct. 114, 54 A. L. R. 1016.' I am there of the opinion that

the attacked section of the Kentucky Statutes is constitutional.''

The Supreme Court in the Semler case, referred to by Judge Dietzman in his opinion, had before it an attack made by a member of the same profession against a similar act passed by the Oregon legislature, and which contained some of the acts prescribed as unprofessional conduct that are found in the amendment under consideration, such as—advertising professional superiority, the performance of professional services in a superior manner, advertising prices for professional services, and others of a similar nature but not necessary to be enumerated. The courts of the State of Oregon sustained the statute and that ruling was affirmed by the Supreme Court in an opinion by Chief Justice Hughes with reasoning that can not be refuted, and which is approved in every case in which the issue was properly presented to which our attention has been called, or which we have been able to find.

The Supreme Court of Arkansas in the case of Thompson v. Van Lear, 77 Ark. 506, 92 S. W. 773, 5 L. R. A., N. S., 588, 7 Ann. Cas. 154, had before it for determination the legality of a similar enactment by the legislature of that state denouncing as unprofessional conduct—for which a physician's license might be revoked by the proper board—''to solicit patients by paid agents.'' The same grounds for the alleged illegality of the act there in question were urged in that court as is done by learned counsel for plaintiff in this case, and which is, that the legislature exceeded the limitations of its authority under its police power in enacting the attacked statute, since it invades the constitutional right of one to engage in a lawful avocation or profession which involves the doing of any and all things, not immoral, that would increase the business or patronage of the one so engaged. The court in the Thompson case was among the first ones to deal with enacted inhibitions against advertisement relating to the practice of medicine and surgery in any of its branches, and it went quite exclusively into a discussion of the question and upheld the validity of the act there involved denouncing and proscribing soliciting of patients through ''paid agents,'' and which was and is but a species of advertisement solely for the purpose of securing patronage. The court in its opinion—like that of many others since then dealing with the same character of question—rec-

ognized a wide distinction between the commercial or purely economic pursuits, and that of the medical profession dealing exclusively with the mental or physical individual. It also clearly pointed out—and which is no doubt the firmly established rule—that one has no inherent right to practice medicine or surgery, or to function in any of its branches free from the right of the legislature under its police power to enact necessary and reasonable regulations looking to complete equipment of the one so engaged to function in his profession in order to guarantee, as much as possible, the members of the public against inefficiency, quackery, empiricism, and other deleterious practices, whereby results harmful to the patient might follow, as well as fraudulent and deceitful practice might be employed by the practitioner.

Some excerpts from the Thompson opinion are pertinent at this point. They are: "Under its police power the state has the right to prohibit things that are hurtful to the comfort, safety and welfare of society. It is now well settled that in the exercise of this power the state may regulate the practice of medicine and surgery. Gosnell v. State, 52 Ark. 228, 12 S. W. 392; Richardson v. State, 47 Ark. 562, 2 S. W. 187; Dent v. West Virginia, 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623; Hawker v. New York, 170 U. S. 189, 18 S. Ct. 573, 42 L. Ed. 1002; State v. Edmunds [127 Iowa 333], 101 N. W. 431; Cooley Const. Lim. 745; 22 Am. & Eng. Enc. Law., 2d Ed., [p.] 780. The law in question concerns the public health over which the police power has the fullest sway; for, health being the sine qua non of all personal enjoyment, it is not only the right, but the duty, of the state to pass such laws as may be necessary for the preservation of the health of the people. 22 Am. & Eng. Enc. Law, 2d Ed., [p.] 922. * * * A physician who has secured a patient by means of a hired agent has paid out a certain sum to obtain his patient, and is under a strong temptation to put him through a course of treatment, whether he needs it or not, in order to get his money back and make a profit on his investment. And therein lies a danger to the public from such a practice. When a physician obtains patients in that way, he in effect buys them, just as if he said to the agent, 'I will pay you a certain sum for every patient you send me'; or, 'Will pay you a certain fee out of the money I receive from each patient you send me.' Now, we do not think prudent people would wish to submit to the advice of a phy-

sician who had paid out money to get them under his treatment. * * * As we have stated, even persons of good health are often too prone to imagine themselves in need of medicine. If it is unsafe to allow such persons to be solicited by hired agents to take what they do not need, how much worse is it to expose the sick to such influences. A man or woman who is laboring under a bodily disease is, other things being equal, more easily imposed on than one who possesses a sound mind in a sound body. The mind of the sick man, like his body, is in an abnormal condition. He is inclined to grasp at shadows and to pursue the wind, and is easily misled into paying money for medical treatment that he does not need. The man who is induced by an agent to buy goods of a merchant can see the goods and judge of their quality before paying his money; but the sick man must take the treatment for which he pays as a matter of faith. * * * The objections which we have stated to this method of securing patients, the temptations to which it would subject the physician and the danger to which it would expose the patient, show a wide distinction between the case of a merchant who drums for custom by hired agents and that of a physician who seeks patronage in the same way. The business of the physician directly affects the public health, and it does not follow because the merchant, the manufacturer, and others may solicit trade through hired agents that a physician may do the same thing. The Legislature has forbidden the physician to do so, and there are in our opinion sound reasons upon which to base the distinction. The law thus undertakes to protect the physician from the temptation and the patient from the danger to which they would be exposed by such a practice. When we consider how easy it would be in many cases for the professional drummer to impose on sick people, and even on those who are well, and induce them to submit to treatment they do not need; when we consider that a physician who had paid for a patient would be under a strong temptation to make a profit out of his investment and to give and charge for treatment whether the patient needed it or not, when we consider the fraud and imposition that would be encouraged by such a method of securing patients—we easily reach the conclusion that the law wisely prohibits a physician from seeking patronage by means of paid agents. It seems to us to be a regulation clearly within the power of the Legislature, to impose upon those who

practice medicine, and that this statute is valid at least to that extent.''

Since the rendition of that opinion on January 27, 1906, many legislatures for the first time have enacted similar statutes inhibiting a member of the profession from ''advertising'' for patrons in any form—and for which he pays and distributes among the public at large within the range of his practice—and in every case where the statute was tested it was upheld. Many of such statutes went no farther than to prohibit ''advertising'' on the part of the practitioner, and they were upheld for the reasons stated in the Thompson opinion by the Arkansas court. We have been unable to find a case wherein the ''advertisement of credit and terms of credit'' *eo nomine* were inhibited by the statute, but that specific practice is nothing more nor less than an effort by which patrons are sought to be brought to the office of the practitioner through the advertised inducement of credit, upon enticing and satisfactory terms. If we should paraphrase some of the excerpts from the Thompson case and insert therein the words ''credit or terms of credit'' for ''paid agents,'' then that opinion would completely fit the facts of this case. It is impossible for us to differentiate between the damaging effects of advertising through paid agents, and advertising by any other means through which patients are drawn to the office of the advertiser, who, perhaps, would never have done so but for the advertisement.

The whole structure of the law in upholding such regulatory measures, as applicable to members of any branch of the medical profession, is bottomed upon the theory that the one engaged in the practice of that profession, or any of its branches, should not engage in any conduct smacking of quackery, but should let his work prove and establish his worth, instead of ''blowing his own horn'' in an effort to bring about that establishment. In other words, it is held—in the interest of efficiency—that a physician practicing in any of the branches of medicine and surgery should let his work speak for itself, and not draw patients unto him through self-directed and paid-for propaganda in the way of advertising inducements of any character—the idea being that the patients should seek the physician because of his capability, and not the physician obtain the patient through their gullibility. The reasons therefor are stated in both the Semler and Thompson opinions. The

declarations made by the writers of those opinions in speaking for their respective courts are approved by the Supreme Court of the State of Washington in the case of Laughney v. Maybury, &c., 145 Wash. 146, 259 P. 17, 54 A. L. R. 393. Besides the cases cited in that opinion rendered following the Arkansas Thompson opinion—there are a number of others found in the annotation to that case as published in the A. L. R. volume beginning on page 400. Inserted excerpts from those opinions containing their reasonings as a part of this opinion are desirable, and would be most convincing, but time and space forbid that we do so, and the reader is referred to the citations for that information.

The principle here involved may be summarized thusly: Government is organized for the benefit and protection of its citizens and their property. Its protection is needed only where the individual citizen is for any cause unable to furnish it. Unfortunately, a large percentage of individuals have not been favored by nature with sufficient resistance to ward off the wiles, tricks and schemes whereby they are defrauded by their more favored brethren. Government may impart to its citizens sufficient education for them to commune with mute printing and receive its message, but more frequently than otherwise, the class referred to do not understand that message, even if they should chance to read it. No Legislature or other department of government can supply the deficiency to which we have referred, but it can—and in proper instances should—forbid the digging of such pitfalls by the more intelligent and selfish members of society, and thus prevent damage and detriment as well as the harvesting of profit from such fraudulent schemes. The authority so exercised is the quintessence of ''Police Power,'' and there is no occasion that speaks louder for its exercise and application than the proper regulation of those engaged in the delicate task of tinkering with the human body. Therefore, the Legislature, though unable to supply the lack of ability on the part of some of its citizens to avoid entanglement in such snares, may, nevertheless, say to their creators, ''Thou shalt not build or operate them.''

Counsel for appellant, in an effort to convince us of the illegality of the involved attacked statute, cite the cases of Chenoweth, Plaintiff in Error v. State Board of Medical Examiners, 57 Colo. 74, 141 P. 132, 51 L. R. A., N. S., 958, Ann. Cas. 1915D, 1188; Forman v.

State Board of Health, 157 Ky. 123, 162 S. W. 796; Rawles v. Jenkins, 212 Ky. 287, 279 S. W. 350; Tolliver v. Blizzard, Police Judge, 143 Ky. 773, 137 S. W. 509, 34 L. R. A., N. S., 890; and Ware, Commonwealth's Attorney, et al. v. Ammon, 212 Ky. 152, 278 S. W. 593. But our examination of each of them demonstrates that the involved statute in them related either to commercial or economic pursuits attempted to be regulated by the Legislature, or the act, though relating to the regulation of the practice of medicine and surgery, was itself so vague as to not be enforcible because of indefiniteness. None of them involved the question of any sort of advertisement relating to the practice of medicine in any of its branches.

Without further amplification of the question we unhesitatingly conclude that the judgment was proper, and for which reason it is affirmed; the whole Court sitting.