WILLIAM M. MEFFERT v. THE STATE BOARD OF MEDICAL REGISTRATION AND EXAMINATION.

No. 13,413. ˙(72 Pac. 247.)

SYLLABUS BY THE COURT.

1. PHYSICIANS AND SURGEONS— *State Board Not a Judicial Tribunal—Findings Conclusive*. The state, in the exercise of its police power in the interest of the health, good government, general welfare and morals of the people, may prescribe the qualifications of persons desiring to practice medicine, and may create a board whose duty it shall be to hear and determine any complaint made against any person holding a physician's license, and revoke such license for any cause provided for in the statute. Such board, while so acting, is not a judicial tribunal and is not

governed by the technical rules applicable to law courts.  In the absence of fraud, corruption, or oppression, the findings of the board are conclusive upon this court.

2. ——— *Cancelation Not a Punishment—Law Not Ex Post Facto.*  Where the statute prescribes the qualifications of a physician, and proscribes the grossly immoral, and authorizes the cancelation of any certificate issued to such persons, the application of this law to one whose habits were grossly immoral before the passage of the law is not in the nature of a punishment; and, therefore, the statute is not *ex post facto*, but has in view only the qualifications of the physician and the protection of public morals.

3. ——— *Law Not Violative of Federal Constitution.*  The clause in the fourteenth amendment to the constitution of the United States, "nor shall any state deprive any person of life, liberty, or property, without due process of law," is not a limitation upon the police power of the state to pass and enforce such laws as in its judgment will inure to the health, morals and general welfare of its people.

Error from Shawnee district court; Z. T. HAZEN, judge.  Opinion filed April 11, 1903.  Affirmed.

*J. Jay Buck, A. L. Redden*, and *W. N. Smelser*, for plaintiff in error.

*C. C. Coleman*, attorney-general, and *Clad Hamilton*, for defendant in error.

The opinion of the court was delivered by

GREENE, J. :  This is a proceeding in error to reverse the judgment of the district court of Shawnee county refusing to grant a temporary injunction prohibiting the state board of medical registration and examination from placing of record, and enforcing, an order theretofore made revoking the license of William M. Meffert to practice medicine and surgery in Kansas.

The statute under which the proceedings were had is chapter 254, Laws of 1901 (Gen. Stat. 1901, §§ 6669–6677), and is entitled "An act to create a state board

of medical registration and examination, and to regulate the practice of medicine, surgery and osteopathy in the state of Kansas, prescribing penalties for the violation thereof, and repealing chapter 68 of the Session Laws of 1870." The board consists of seven members. The only provision of this law specially involved in this litigation is that part of section 2 which reads:

"All persons engaged in the practice of medicine on the date of the passage of this act shall, within four months from the date of such passage, apply to the board of registration and examination for a license to practice. . . . The board may refuse to grant a certificate to any person guilty of felony or gross immorality or addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery, and may, after notice and hearing, revoke the certificate for like cause."

The petition in this action contains as exhibits copies of the accusations made against plaintiff in error to the state board of medical registration and examination. It appears that at a meeting of the citizens of Emporia a committee of three was appointed to formulate charges against plaintiff in error and present them to the state board of medical examiners for the purpose of having his license revoked. These charges, while not as formal or specific as would be required in an information or an indictment, were ample to challenge the attention of the board and to notify the plaintiff in error of the nature of the accusations made against him. Among these exhibits were a resolution passed by the board of education of the city of Emporia, discharging one of its female teachers for associating with the plaintiff in error ; a statement "that he was a man notorious in Emporia for his immorality"; a request, signed by eighteen practicing

physicians and surgeons of Emporia, stating that "we have ground to believe that he is grossly immoral and we know that he is guilty of other unprofessional conduct of such a degree that we will not meet him in consultation or recognize him as a member of the medical profession"; another request, signed by the pastors of nine of the churches of Emporia, and another, signed by thirty-eight of the business men of Emporia, each stating that Meffert was grossly immoral, and asking that his license to practice medicine be revoked; an affidavit of O. M. Wilhite, charging the plaintiff in error with numerous acts unprofessional, grossly immoral, and criminal. Copies of these charges and complaints were served on plaintiff in error and a notice informing him when such charges would be heard.

Upon the hearing the plaintiff in error appeared with his counsel. Affidavits and oral testimony were introduced by both parties. The board found that plaintiff in error was grossly immoral, and revoked his license to practice medicine or surgery in Kansas. Proceedings were then instituted in the court below perpetually to enjoin the board from entering such order or otherwise enforcing the same. A demurrer was filed to the petition, which was sustained, from which this proceeding was prosecuted.

It is alleged in the petition:

"Said board has no power or authority to revoke said license and said certificate for the reason that 1. Board not a this plaintiff has a vested interest in his judicial tribunal. calling and profession, and the practice thereof, and he cannot be deprived of the same except by the judgment of a court of competent jurisdiction, duly rendered, for offenses and actions committed by himself that pertain and relate to the practice of his said profession, and that have been committed since

the 21st day of March, 1901, and are of the nature and character that would warrant, and for which the law authorizes, a revocation of his license and certificate ; and said board is not a judicial body and has no power or right to act in a judicial capacity and any and all acts and attempts on their part to so act are a nullity and void."

There are no allegations of fraud, corruption or oppression on the part of the board in its proceedings, and we think the questions presented for our determination are involved in the allegations of the petition quoted.

One of the rights reserved to the state is to determine the qualification for office and the conditions upon which citizens may exercise the various callings and pursuits within its limits. This power was recognized in England more than 300 years ago, and has been the law of that country ever since. ( *Dr. Bonham's Case*, 4 Coke, 367.)

In *Dent v. West Virginia*, 129 U. S. 114, 122, 9 Sup. Ct. 231, 233, 32 L. Ed. 623, the court said ;

"The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."

A surfeit of authority might be cited holding that the state in the exercise of its police power may prescribe the qualifications which a physician must possess before entering upon the practice of medicine or surgery. ( *State v. State Medical Examining Board*, 32 Minn. 324, 20 N. W. 238, 50 Am. Rep. 575 ; *Thompson v. Hazen*, 25 Me. 104 ; *Eastman v. The State*, 109

Ind. 278, 10 N. E. 97, 58 Am. Rep. 400 ; *State v. Call,* 121 N. C. 643, 28 S. E. 517 ; *People v. Hasbrouck,* 11 Utah, 291, 39 Pac. 918 ; *Hawker v. New York,* 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002 ; *The State v. Wilcox,* 64 Kan. 789, 68 Pac. 634.)

The board of medical registration and examination is not a judicial tribunal. While it may be said to act *quasi*-judicially, it is only a ministerial board and performs no judicial functions. It is classed with such boards as the county boards of equalization, boards for the examination of applicants for teachers' certificates, city councils in granting and refusing a business or occupation license, and numerous other boards of similar character. Such boards perform no judicial functions, are not judicial tribunals, and have never been classed as such. ( *State v. State Board of Medical Examiners,* 34 Minn. 387, 26 N. W. 123 ; *Wilkins v. The State,* 113 Ind. 514, 16 N. E. 192 ; *The State, ex rel. Burroughs, v. Webster et al.,* 150 id. 607, 50 N. E. 750, 41 L. R. A. 212 ; *State v. Hathaway,* 115 Mo. 36, 21 S. W. 1081 ; *State Board of Health v. Roy,* 22 R. I. 538, 48 Atl. 802.)

It is contended that the procedure before the board in the admission and rejection of evidence was violative of the rights of Meffert, in that the evidence received and acted upon was made up largely of unsupported accusations, hearsay and street rumor, and was not sufficient to sustain the findings. The provisions of the act creating the board plainly indicate that such investigation was not intended to be carried on in observance of the technical rules adopted by courts of law. The act provides that the board shall be composed of seven physicians. These men are not learned in the science of law, and to require of a board thus composed that its investigations be conducted

in conformity to the technical rules of a common-law court would at once disqualify it from making any investigation. It is subversive of the morals of the people and degrading to the medical profession for the state to clothe a grossly immoral man with authority to enter the homes of her citizens in the capacity of a physician. It was the intention of the legislature to adopt a summary proceeding by which the morals of the people and the dignity of the profession might be protected against such a possibility without being embarrassed by the technical rules of proceedings at law.

In the case of *Lynch v. Chase*, 55 Kan. 367, 40 Pac. 666, many questions similar to those presented by plaintiff were involved. Chapter 239, Laws of 1889, provided for the appointment of committees by the governor, lieutenant-governor, and speaker of the house, to investigate the affairs of state institutions and conduct of said officers. Under this law a committee was appointed to investigate the affairs of the state penitentiary and the conduct of S. W. Chase, the warden of that institution. An investigation was had and the committee found and reported several acts of official misconduct and insufficiency in office and recommended his removal. The governor ordered his removal and immediately appointed Lynch to succeed him. Upon a refusal to surrender the office Lynch prosecuted a proceeding in *quo warranto*. It was held that "a summary proceeding of this character is not like a common-law trial, nor are the same precision and accuracy required as in a trial before a court"; that "the allegation that the testimony was insufficient to sustain the findings is without force"; that the "evidence was heard and considered by a tribunal created for that purpose, and the duty of

determining its sufficiency belongs to that tribunal, and not to the court.'' The same question was involved in *School District v. McCoy*, 30 Kan. 268, 1 Pac. 97, 46 Am. Rep. 92, and decided against the contention of plaintiff in error.

Meffert was timely notified of the charges preferred against him, the time when a hearing would be had, and was given ample opportunity to refute such charges.    The findings by the board are conclusive upon this court.

It is contended that the immoral conduct with which plaintiff in error was charged was not practiced by him in the line of his profession, and therefore was not cognizable by the board.    The law is not that the board must find that such person has been grossly immoral with his patients, but that he is grossly immoral in his general habits.    We only mention this contention to condemn it.    The object sought is the protection of the home of the sick and distressed from the intrusion therein, in a professional character, of vicious and unprincipled men—men wholly destitute of all moral sensibilities.    It was not the purpose of the lawmakers to clothe a man with a certificate of moral character and send him out to prey upon the weak and unsuspecting—upon those who would be entirely at his mercy—and quietly await the accomplishment of that which observation and experience have taught us is certain to follow, before depriving such person of the indorsement which gave the opportunity to commit such wrong.

The law disqualifies one guilty of a felony.    It would hardly be contended that the felony for which a license may be revoked must have been committed upon a patient, or against the property of a patient, or while such physician was attending a patient.

It is further contended that the right of a physician to practice his profession is a property right, of which he cannot be deprived without due process of law, which plaintiff in error construes to mean the judgment of a constitutionally created court. We have seen that it is within the police power of a state to prescribe the qualifications of one desiring to practice medicine, and also to provide for the creation of a board or tribunal to make the examination and determine whether the applicant for a license to follow this profession possesses the required qualification, and if so to issue to him such license. It must follow that the state may confer upon the same board or tribunal the power to revoke such license, if it should thereafter be made to appear that the license should not have been issued, or if for any reason the holder thereof since its issuance has become disqualified.

3. Not violative of federal constitution.

The argument is that to deprive a physician of his right to practice medicine otherwise than by a judgment of forfeiture by a judicial tribunal is without due process of law, and is in violation of the fourteenth amendment to the constitution of the United States, which declares : "Nor shall any state deprive any person of life, liberty, or property, without due process of law." This constitutional provision is not a restriction or limitation on the police power of the state to pass and enforce such laws as in its judgment will inure to the health, morals or general welfare of its people. Such power is reserved to the state, which has been so recognized by all courts since the adoption of this amendment. In *People v. King*, 110 N. Y. 418, 423, 18 N. E. 245, 246, 1 L. R. A. 293, 6 Am. St. Rep. 389, it was said :

"But, as the language of the constitutional prohibi-

tion implies, life, liberty and property may be justly affected by law, and the statutes abound in examples of legislation limiting or regulating the use of private property, restraining freedom of personal action or controlling individual conduct, which, by common consent, do not transcend the limitations of the constitution. This legislation is under what, for lack of a better name, is called the police power of the state, a power incapable of exact definition, but the existence of which is essential to every well-ordered government. By means of this power the legislature exercises a supervision over matters involving the common weal and enforces the observance, by each individual member of society, of the duties which he owes to others and to the community at large. It may be exerted whenever necessary to secure the peace, good order, health, morals and general welfare of the community, and the propriety of its exercise within constitutional limits is purely a matter of legislative discretion with which the courts cannot interfere.''

In *Barbier v. Connolly*, 113 U. S. 27, 31, 5 Sup. Ct. 357, 359, 28 L. Ed. 923, the court, in speaking upon this subject, used the following language :

''But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state ; develop its resources and add to its wealth and prosperity.''

In *Mugler v. Kansas*, 123 U. S. 623, 665, 666, 8 Sup. Ct. 273, 299, 31 L. Ed. 205, the court said :

'' 'The constitutional prohibition upon state laws impairing the obligation of contracts does not restrict the power of the state to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such

contracts. Rights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations.'

"The principle, that no person shall be deprived of life, liberty, or property, without due process of law, was embodied, in substance, in the constitutions of nearly all, if not all, of the states at the time of the adoption of the fourteenth amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.

"'By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the constitution, necessarily entrench upon any authority which has been confided, expressly or by implication, to the national government.' "

To the same effect are *Kidd v. Pearson*, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346, and *In re Rahrer*, 140 id. 545, 11 Sup. Ct. 865, 35 L. Ed. 572.

In *The City of Cincinnati v. Steinkamp, Trustee*, 54 Ohio St. 284, 291, 43 N. E. 490, the court, in speaking of the act to regulate the construction of buildings within cities of the first class and first grade, and to provide for the appointment of an inspector of buildings, said : "This section does not abridge the exercise of the police power of the states, nor limit the subjects upon which they may legislate." In *Leisy v. Hardin*, 135 U. S. 100, 127, 10 Sup. Ct. 690, 34 L. Ed.

128, Mr. Justice Gray, in speaking of the exercise of the police power of the state, said :

"Among the powers thus reserved to the several states is what is commonly called the police power — that inherent and necessary power, essential to the very existence of civil society, and the safeguard of the inhabitants of the state against disorder, disease, poverty, and crime."

This contention was very aptly and forcibly answered by the supreme court of Minnesota in *State v. Board of Medical Examiners*, 34 Minn. 387, 389, 390, 26 N. W. 123, 124, where it was said :

"The radical fallacy in this chain of argument is the assumption that the revocation of such a license is the exercise of judicial power. 'Due process of law,' or 'the law of the land,' (which means the same thing,) is not necessarily judicial proceedings. Private rights and the enjoyment of property may be interfered with by the legislative or executive, as well as the judicial, department of government.  When it is declared that a person shall not be deprived of his property without 'due process of law,' it means such an exercise of the powers of government as the settled maxims of law permit and sanction, under such safeguards as these maxims prescribe for the class of cases to which the one in question belong. . . . It has never been held that the granting, or refusing to grant, such a license as this was the exercise of judicial power, and in fact this is not claimed in this case ; and there is no possible distinction in this respect between refusing to grant a license and revoking one already granted.  Both acts are an exercise of the police power.  The power exercised and the object of its exercise is, in each case, identical, viz., to exclude an incompetent or unworthy person from this employment.  Therefore the same body which may be vested with the power to grant, or refuse to grant, a license, may also be vested with the power to revoke.  The statutes of all the states are

full of enactments giving the power to revoke licenses of dealers, innkeepers, hackmen, draymen, pawn-brokers, auctioneers, pilots, engineers, and the like, to the same bodies, boards, or officers who are author-ized to issue them, such as city councils, county com-missioners, selectmen, boards of health, boards of excise, etc. The constitutionality of such laws, as a valid exercise of the police power, has often been sustained and indeed rarely questioned.''

Another contention is that the state board of med-ical examiners had no power to revoke the license theretofore issued, because the acts for which the commission was revoked, if committed at all, were committed before the passage of the law creating the board, and, therefore, as to such acts, the law is *ex post facto*. Conceding that the evidence introduced before the state board of medical examiners related to acts of immorality occurring be-fore the passage of the law creating the board, does it follow that the law is *ex post facto* as applied to plain-tiff in error? An *ex post facto* law is one that imposes a punishment for an act that was not punishable at the time it was committed, or imposes an additional punishment to that then prescribed, etc.

The revocation of a license to practice medicine for any of the reasons mentioned in the statute was not intended to be, nor does it operate as, a punishment, but as a protection to the citizens of the state. Such requirements go to his qualifications; and where the qualification imposed is reasonable, one has no right to complain that he is deprived of the right to practice his profession because he has not conformed to such reasonable regulations. The legislature has empow-ered the different cities of the state to assess a busi-ness license-tax upon nearly all kinds of trades, professions, business, and occupations, upon the pay-

ment of which, and in some instances the conformity to other reasonable regulations, the city issues to such persons a license to carry on such business, occupation, profession, or trade, and for the non-performance of such condition, or non-payment of the stipulated license, such permission may be canceled or withheld.   It has never been thought that the withholding or revocation of such license was in any sense a punishment.   If the revocation were intended as a punishment there might be force in this argument, but since the only purpose of the law was to require a certain standard of morals of the physician, the argument is without force.

Our attention has been called to the cases of *Commings v. The State of Missouri*, 4 Wall. 277, 316, 18 L. Ed. 356, and *Ex parte Garland*, 4 id. 333, 18 L. Ed. 366.   The same questions were involved in those two cases, and in rendering the opinion in the latter case the principles announced in the former were generally relied on.   Mr. Cummings was a Catholic priest, and was indicted and convicted of teaching and preaching, as a minister of that religious denomination, without taking what was known as the "test" oath.   Mr. Justice Field, in delivering the opinion of the court, said :

"The oath prescribed by the constitution, divided into its separable parts, embraces more than thirty distinct affirmations or tests.   Some of the acts against which it is directed constitute offenses of the highest grade, to which, upon conviction, heavy penalties are attached.   Some of the acts have never been classed as offenses in the laws of any state, and some of the acts, under many circumstances, would not even be blameworthy.   It requires the affiant to deny, not only that he has ever 'been in armed hostility to the United States, or to the lawful authorities thereof,' but, among other things, that he

has ever 'by act or word,' manifested his adherence to the cause of the enemies of the United States, foreign or domestic, or his *desire* for their triumph over the arms of the United States, or his *sympathy* with those engaged in rebellion, or has ever *harbored* or *aided any person* engaged in guerrilla warfare against the loyal inhabitants of the United States, or has ever *entered* or *left* the state for the purpose of avoiding enrolment or draft in the military service of the United States ; or, to escape the performance of duty in the militia of the United States, has ever indicated *in any terms,* his *disaffection* to the government of the United States in its contest with the rebellion.

"Every person who is unable to take this oath is declared incapable of holding, in the state, 'any office of honor, trust or profit under its authority ; . . . or of acting as a professor or teacher in any educational institution, or in any common or other school, or of holding any real estate or other property in trust for the use of any church, religious society, or congregation,' . . . be competent, as a bishop, priest, deacon, minister, elder, or other clergyman, of any religious persuasion, sect, or denomination, to teach, or preach, or solemnize marriage."

The severest punishment was prescribed for violation of those provisions of the constitution. On page 318, the court said : "The oath thus required is, for its severity, without any precedent that we can discover." On page 319, the court stated the fact upon which it held this law unconstitutional and void, as follows :

"Qualifications relate to the fitness or capacity of the party for a particular pursuit or profession. Webster defines the term to mean 'any natural endowment or any acquirement which fits a person for a' place, office, or employment, or enables him to sustain any character, with success.' It is evident from the nature of the pursuits and professions of the parties, placed under disabilities by the constitution of Missouri, that many of the acts, from the taint of which they must

purge themselves, have no possible relation to their fitness for those pursuits and professions. . . . The oath could not, therefore, have been required as a means of ascertaining whether parties were qualified or not for their respective callings or the trust with which they were charged. It was required in order to reach the person, not the calling. It was exacted, not from any notion that the several acts designated indicated unfitness for the callings, but because it was thought that the several acts deserved punishment, and that for many of them there was no way to inflict punishment except by depriving the parties, who had committed them, of some of the rights and privileges of the citizen."

It was held that, as this law was intended as a punishment for past offenses and not to prescribe a qualification for duties to be performed or callings to be pursued, it was *ex post facto*, and therefore void. In these particulars it is easily distinguishable from the case under consideration and is not an authority for the contention of plaintiff in error.

We have not overlooked the language used by this court in *Peyton's Appeal*, 12 Kan. 398, 405, wherein the court, speaking of a disbarment proceeding, said : "The whole thing is in the nature of a criminal forfeiture." Counsel for plaintiff in error seek to apply the principle there announced to the proceeding before the board in this case. We are not prepared to say that the language there used does not express the law as applicable to disbarment proceedings, under section 393, General Statutes of 1901, which reads :

"An attorney or counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge, or a party to an action or proceeding, or brings suit or commences proceedings without authority therefor, is liable to be disbarred, and shall forfeit to the injured party treble damages, to be recovered in a civil action."

It appears that disbarment for the reasons mentioned in said section is in the nature of a punishment, which differentiates the law of disbarment from the revocation of a physician's license because disqualified.

We are of the opinion that the petition states no ground for equitable relief, and there was no error committed by the court below in sustaining the demurrer to the petition.

The judgment is affirmed.

All the Justices concurring. CUNNINGHAM, J., not sitting.