[No. 13044. Department Two. July 17, 1916.]

## STATE BOARD OF MEDICAL EXAMINERS, *Appellant*, v. J. EUGENE JORDAN, *Respondent*.[1]

PHYSICIANS AND SURGEONS—LICENSE—REVOCATION—PROCEEDINGS—COMPLAINT—SUFFICIENCY. A complaint before the medical board for unethical conduct by a physician need not be drawn with legal nicety, and is sufficient where it charges advertising in a certain newspaper on a certain day and in sundry other editions thereof during the latter part of 1913 and 1914, which advertisements were intended to and had a tendency to deceive the public and to be harmful and injurious to public morals or safety and constituted unprofessional conduct; especially where eleven days before the trial the accused was furnished with a list of the publications.

SAME—UNPROFESSIONAL CONDUCT—ADVERTISING—STATUTES. Rem. & Bal. Code, § 8397½, subd. 3, including within the definition of unprofessional conduct by a physician all advertising of medical business which is intended or has a tendency to deceive the public or impose upon credulous or ignorant persons and so be harmful or injurious to public morals or safety is not void for uncertainty in failing to furnish any standard by which it can be determined what advertisements offend.

SAME—UNPROFESSIONAL CONDUCT—ADVERTISING—INTENT—EVIDENCE—SUFFICIENCY. An advertisement enumerating six incurable diseases which the accused cures, as well as others that are incurable in the majority of cases, shows the accused's bad faith in advertising with intent to deceive, within Rem. & Bal. Code, § 8397½.

SAME—UNPROFESSIONAL CONDUCT—ADVERTISING—STATUTES. Under Rem. & Bal. Code, § 8397½, making it unprofessional conduct for a physician to employ advertisements of medical business intended to or having a tendency to deceive, the question of moral turpitude is not essential, as the statute determines what advertisements are bad; nor is it necessary to show that actual harm has come to any one through the accused.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for King county, French, J., entered April 13, 1915, upon findings in favor of the defendant, reversing the revocation of a physician's license, on appeal from an order of the medical board, after a hearing before the court. Reversed.

[1]Reported in 158 Pac. 982.

*The Attorney General* and *Howard Waterman, Assistant,* for appellant.

*Walter S. Fulton* (*Dorr & Hadley,* of counsel), for respondent.

BAUSMAN, J.—The medical board appeals from the superior court's reversal of its order revoking the license of Jordan. The statutory provisions involved are Rem. & Bal. Code, § 8397 *et seq.,* and more particularly that section which, defining unprofessional conduct, includes:

"Third. All advertising of medical business which is intended or has a tendency to deceive the public or impose upon credulous or ignorant persons, and so be harmful or injurious to public morals or safety." Section 8397½.

The complaint alleged as follows: .

"That the defendant is a licensed practitioner of medicine and surgery under the laws of the state of Washington; that he advertised his medical business in the Seattle Daily Times of Wednesday, October 1, 1913, and in sundry other editions of said Seattle Daily Times during the latter part of 1913 and the year 1914, that such advertising of his medical business was such as intended or has a tendency to deceive the public or impose upon credulous or ignorant persons and so be harmful or injurious to public morals or safety, in which respect defendant has been guilty of unprofessional conduct."

The lower court confined the board to the named advertisement of October, excluding its numerous questions to Jordan as its witness intended to bring out his ignorance of diseases that he advertised to cure, but at the same time permitted Jordan to show alleged specific cures. The advertisement which the court did admit is as follows:

## "BRIGHT'S DISEASE CURED.

"Another Case of the So-Called Incurable Disease Completely Cured—This Did Not Happen in Central Africa, but

Right Here in Seattle—Do You Know of Any other Physician Who Can Do It?

"September 24, 1913.

"I was taken down with acute Bright's Disease last February and was not expected to recover. I became so dropsical that I could hardly move in bed. My condition became so desperate that the doctors in attendance held out no hope. Doctor J. Eugene Jordan was suggested as a last resort and as I had nothing to lose and everything to gain, I started to use his Glandular Remedies. I began to mend at once and in three months not a particle of albumen could be found where before it was loaded with it. I gained back the thirteen pounds that I had lost and my kidneys are as good as they were before.          (Signed) Ad Goings.
8016 Twelfth Avenue Northwest.

"The above testimonial, like the many others which have appeared in this journal, demonstrate the thoroughness and permanency of Doctor J. Eugene Jordan's cures of Tuberculosis, Asthma, Anaemia, Blindness, Bright's Disease, Ulceration of the Bones, Chronic Catarrh, Chronic Inflammation of the Bladder, Deafness from paralysis of the Auditory Nerves, Diabetes, Prolapsus Uteri, Dropsy, Chronic Dyspepsia, Epilepsy, Epithelioma (skin cancers), Chronic Erysipelas, Chronic Gastralgia, Hard Lumps in Breast, Heart Disease (including Heart Leakage), Hip Disease, Infantile Paralysis, Insanity, Jaundice, Rheumatism, Meningitis, Chronic Neuralgia, Paralysis, Locomotor Ataxia, Sciatica, Senile Gangrene, Spinal Curvature, Strabismus, St. Vitus' Dance, Ulceration of Stomach or Bowels and most other so-called incurable diseases.

"Doctor J. Eugene Jordan is a fully accredited physician under the laws of the State of Washington and is an ex-professor of Chemistry and Toxocology of the Hahnemann College and Hospital of Chicago, Ill. He has practiced in Seattle continuously for the past 28 years.

"There being a number of Doctors Jordan in Seattle, it is well to bear in mind the full name and address of Doctor J. Eugene Jordan, 619½ First Avenue, Seattle. Office hours, 9 a. m. to 8 p. m.; Sundays, from 2 p. m. to 6 p. m. Consultation free. Watch each Sunday Times for remarkable cures."

The respondent to support the judgment argues, first, that the complaint is insufficient; second, that the statute is invalid; third, that the testimony of defendant's patients and himself showed that he had reasons for belief in his advertisements from a fair percentage of cures, and that no patient is shown to have been harmed. The appellant board combats all these positions, and claims at least a new trial because the court should have admitted the other advertisements as well as the rejected questions.

While we deem the lower court wrong in both the last named particulars, we see no occasion for a mere new trial, because upon the record as it stands the case can be decided now. We will discuss it in the order of the contentions made by respondent.

I. This complaint was sufficient. The statute has wisely allowed defendant a first hearing before brothers in his own science. To say that such persons, unacquainted with the law, must conduct these examinations or invite them with legal nicety will not do. We so held even on misdemeanor for practicing without a license. *State v. Greiner*, 63 Wash. 46, 114 Pac. 897. The courts uphold the less technical practice: *Meffert v. State Board of Medical Registration and Examination*, 66 Kan. 710, 72 Pac. 247, 1 L. R. A. (N. S.) 811; *Munk v. Frink*, 81 Neb. 631, 116 N. W. 525, 17 L. R. A. (N. S.) 439.

Defendant's rights were easily protected either by demand for particulars or by motion to make more definite. Moreover, eleven days before trial in the superior court, the board voluntarily furnished a list of all the publications.

The case was not criminal by its nature. The legislature had an undoubted right to classify this proceeding and it did so in § 8399, by providing that appeals from the board should stand for trial "in all respects as ordinary civil actions, and like proceedings be had thereon." In *Reetz v. Michigan*, 188 U. S. 505, a statute was upheld which, even as to previously licensed practitioners, required examination or

approval by the board, the defendant vainly contending that this retroactive proceeding of forfeiture was quasi criminal. It was also held that even the right of trial guaranteed in "due process of law" does not involve the right of a *judicial* trial. See, also, *Hawker v. People of State of New York*, 170 U. S. 189. In *State ex rel. Murphy v. Snook*, 78 Wash. 671, 139 Pac. 764, we held disbarment proceedings to be noncriminal.

II. As to the constitutionality of these statutes, this court has frequently affirmed it from *State v. Carey*, 4 Wash. 424, 30 Pac. 729, down to *State v. Pratt*, 80 Wash. 96, 141 Pac. 318. Nearly every question has been met, including that of class legislation and of delegation of legislative authority.

Respondent presses, though, an uncertainty in the third subdivision of the section now involved. It furnishes, he says, no standard by which either board or court can determine what advertisement offends, in support of which he cites: *Matthews v. Murphy*, 23 Ky. Law 750, 63 S. W. 785; *Hewitt v. State Board of Medical Examiners*, 148 Cal. 590, 84 Pac. 39, 113 Am. St. 315, 3 L. R. A. (N. S.) 896; *Czarra v. Board of Medical Supervisors*, 25 App. D. C. 443.

None of these case, however, cover the present situation. The statutes were clearly less particular than ours. That of Kentucky provided that the board might revoke the practitioner's certificate if he were "guilty of grossly unprofessional conduct of a character likely to deceive or defraud the public." It is plain that here no acts whatever were specified and any offense from advertisement was debatable. Our own statute, far more specific, enumerates seven things that constitute unprofessional conduct. The one relating to advertisement cannot well be made more specific. To describe in express terms a faulty advertisement is practically to instruct the defendant how to evade it, and as to the limitless variations of language, symbols, and verbal or pictorial allurements, no human ingenuity could possibly anticipate and forestall them. The supreme court of Kentucky, in *Forman*

*v. State Board of Health,* 157 Ky. 123, 162 S. W. 796, has, moreover, clearly relaxed the severity of the earlier decision.

As to the California or *Hewitt* case, the court did find insufficient a clause against advertising which was as follows: "All advertising of medical business in which grossly improbable statements are made." But it is curious that that court in the decision did not drive the legislature to an express form. On the contrary, it held that general language would be sufficient, and suggested the very language since incorporated in our statute now attacked as insufficient. Apparently this suggestion of the California court was taken over by those who prepared our law.

The *Czarra* case attacked a statute which provided only against "unprofessional or dishonorable conduct."

To us there seems a happy reply on any basis to arguments of this sort. Under our statute the defendant is not tried on the advertisement alone but on the advertisement and his capacity, qualifications, or actions to fulfill it. The appeal to the superior court secures a trial *de novo*. In such trial a proper line of proof is not only the advertisement, but the competence of the defendant to do what he advertises he can do. The issue then becomes like that in getting money by false pretenses, which no legislature has ever been required to define. The crime is determined not from the representations alone but from all the actions and circumstances in which intent can be gathered.

Our law has not prevented a practitioner from advertising cures or inviting the public to his healing, but only advertisements intended to beguile. It attacks not mere unethical conduct but wrongful conduct. If from the testimony it appears that he either does not cure the diseases, never has cured them, cannot cure them, or does not know what they are, the law has then a right to say it is advertising to deceive. This fully explains why the California court, dissatisfied with "grossly improbable statements," which would have made a mere academical or legal debate,

was satisfied to suggest the present form for a different issue.

III.  Finally, respondent contends that upon the whole evidence we must uphold the good faith of the advertiser. From that evidence we conclude the very contrary.  We think, without considering also the rejected advertisements, which were equally brazen with the one admitted, that nothing can be more clear than that we have here the language of a charlatan.  It was clearly proved that of the diseases which he recklessly advertised himself as curing, the following are wholly incurable:  Bright's disease, deafness from paralysis of the auditory nerve, infantile paralysis, locomotor ataxia, spinal curvature, and senile gangrene, while the others are incurable in the great majority of cases. These things were established by ten practitioners in the defendant's science.  He, for his part, called not one to sustain him in anything.

Taking the advertisement itself and applying common sense based upon a general view of the arts and sciences, we see upon its face every mark of the voluble humbug or unscrupulous quack.  Just when a medical advertisement may be offensive to this statute we do not attempt to say, but either this advertisement offends the statute or there is none that can offend it.  This practitioner spreads his pretensions over all branches of this vast science, through diseases of the kidneys, of the ears, of children, of the nerves, and of the heart.  Blindness comes within his power, insanity, cancer.  A cure of any one of the maladies proved to be incurable would have made this man famous.  Cures in several, as advertised by him, would have raised him to a prodigy. Yet not one cure is proved by any testimony that among men of science would be credited for a moment.  When we consider the zeal with which physicians adopt new remedies and both follow and proclaim the discoveries of their brothers, and the elevation that comes in this way to modest and

patient investigators, defendant's attributing envy to the state board is but an aggravation of his bad conduct.

In spite of protection from the lower court in the excluded questions, his examination was so humiliating that even his adroit and capable counsel felt obliged to suggest to him at times the propriety of answering questions obviously fair. His explanation of his own theories is such that even a layman cannot peruse it without a smile. His testimony is one long flux of garrulity and evasion.

Nor are we impressed by some twenty witnesses testifying to his cures. Many of these had been under treatment by other doctors, none of whom were called by the defendant, who must have known beforehand that they would be named. Nearly all the patients were uncertain what their ailments really had been. Practically no proof was given in this respect except that the defendant had told them such were their maladies. He for his part gave no diagnoses from which scientific men could review them. Several plainly did not have the maladies they thought they had.

One additional question. It is said that, granting the statute to be constitutional, still the lower court was right in ruling an advertisement not bad unless there is in it moral turpitude, and that while this is not specified in the advertising clause of the statute, it should be read into it because the six other clauses aim at immoral things. Counsel cites *Forman v. State Board of Health, supra.* This clause is not exposed to that rule. Besides this third ground, the section names abortions, betraying of professional secrets, the giving of medicines for certain purposes to women, conviction involving moral turpitude, habitual intemperance, and the personification of another practitioner's name. In respect to advertising it excludes the idea of association with the other clause for it says what purport in an advertisement shall be bad. It forbids any advertisement intended or tending to deceive. The *Forman* case had before it a statute with nothing in it respecting advertising at all, and the ad-

vertising offense had to be attacked under the general "other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public." Thus there was not even an attempt to define advertising. However, we should not hesitate to hold this section good under the rule of association too. It is not merely unethical but immoral to get money from the poor, the simple, or the ignorant, by advertising the cure of what is incurable, and the courts will call that incurable which the present stage of knowledge so pronounces. *Freeman v. State Board of Medical Examiners* (Okl.), 154 Pac. 56.

Nor was it incumbent on the state to show whether actual harm had yet come to any one through this practitioner. That is not material. The statute aims to protect the purse as well as the health from quacks, and the other burden, if cast on the board, would, through the many confusing and contributing influences on the health of patients, make proof exceptionally difficult.

The decision of the lower court is reversed, with instructions to enter a judgment affirming in the superior court the order of the board appealed from.

MORRIS, C. J., and MAIN, J., concur.

HOLCOMB, J. (dissenting)—I dissent. No one can read the record dispassionately in this case without being convinced that the advertising complained of deceived no one and on the contrary very strongly preponderated with respondent that he did, in all the cases questioned, accomplish results satisfactory to all patients. Respondent's general qualifications to practice medicine are not in question. If, as a matter of fact—and this is almost purely a question of fact—he did not deceive any one, how can it be contended and adjudged as a matter of law that respondent's advertising "*had a tendency* to deceive and impose upon credulous and ignorant persons, and so be harmful or injurious to public . . . safety?" With the professional propriety of such advertising, we have nothing to do.