No. 24,321.

ALBERT D. JONES, Jr., *Appellant*, v. THE KANSAS STATE BOARD OF MEDICAL REGISTRATION AND EXAMINATION, *Appellee.*

SYLLABUS BY THE COURT.

PHYSICIANS AND SURGEONS—*Examination for License to Practice—Power of Medical Board to Prescribe Rules Governing Examinations and Qualifications of Applicants.* The state board of medical registration and examination has power to promulgate and enforce a rule that only graduates of medical colleges whose standard of excellence is denominated as class "A" by the American Medical Association will be permitted to take the examination for licenses to practice medicine and surgery in this state; and the board may refuse to examine graduates of class "C" medical colleges, which are those that refuse to permit a representative of the American Medical Association to inspect the quality and extent of their courses of instruction and matters pertinent thereto.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed July 8, 1922. Affirmed.

*A. E. Crane,* and *Fearn Messick,* both of Topeka, for the appellant.

*Richard J. Hopkins,* attorney-general, and *W. C. Ralston,* assistant attorney-general, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff, Albert D. Jones, jr., brought this action in the district court to compel the defendant, The Kansas State Board of Medical Registration and Examination, to permit him to take the examination for a license to practice his profession as a physician and surgeon in this state.

The district court denied the writ of mandamus prayed for, and plaintiff appeals.

The facts touching plaintiff's qualifications are not in dispute. Jones is a resident of Topeka, 27 years old, of good moral character, and has studied medicine and surgery for four years during terms of not less than six months each year, and has paid the examination fee, and otherwise conformed to the rules prescribed by the

defendant board for candidates for examination, except on one point which will require careful statement herein.

It appears that there is in this country an unofficial organization known as the American Medical Association, the membership of which and the purpose of which are not disclosed, but which we may presume to consist of eminent men in the medical profession who are prompted by a laudable desire to elevate the standard of their profession and the standard of medical schools; and this association has classified the medical colleges of this country into three groups, A, B, and C. Class "A" colleges are those whose entrance requirements, courses of study, teaching staffs and equipment and the like are of a satisfactory standard of excellence. Class "B" colleges are of a lower grade of excellence but which may shortly attain to first-class standards.

Class "C" medical colleges are simply those which refuse to countenance any inspection, supervision or meddling with their collegiate work by any representative of this unofficial "American Medical Association," and as to which colleges this so-called association has no authentic data. These class "C" colleges do permit and invite all state boards of medical examiners to visit and inspect their collegiate work, and the defendant board has that privilege.

The Kansas City College of Medicine & Surgery, which is the school plaintiff attended and from which he was graduated, is a class "C" college. It repudiates the unofficial suzerainty of the American Medical Association, but permits and invites, inspection by official boards of medical examiners, including the defendant board. The latter has not inspected this college since 1917, at which time it approved its qualifications and equipment and allowed some of its graduates to take the state examination.

In 1918 the defendant board promulgated a rule:

"That nothing but 'A' class colleges be recognized after February 15, 1922, and in the meantime graduates from class 'B' schools will be permitted to take the examination until February 15, 1922, but no recognition hereafter will be given a college in class 'C'."

The gist of plaintiff's contention is that the defendant had no power to promulgate this rule, nor to prescribe qualifications for candidates for examination in addition to those prescribed by statute.

The powers conferred upon the state board are found in article

24 of chapter 108, General Statutes of 1915, §§ 10197-10206. Coun-
sel for the state board cite a clause in section 10197 as justifying the
board's power to make the rule which bars the plaintiff from the
right to take the examination. This clause reads:

"It [the board] shall formulate rules to govern its actions."

Elsewhere in the statute we note certain powers which the legis-
lature intended the board to exercise:

The board is required to keep a register of all applicants for
licenses to practice medicine, the age of the applicants, a record of
the time they have spent in the study of medicine, and the name of
the institution or institutions from which the applicants may have
received degrees or certificates of medical instruction. (§ 10197.)
The board may refuse licenses to felons, to grossly immoral persons,
and to those seriously addicted to liquor or drug habits. (§ 10198.)

The board is also authorized to grant licenses to graduates of
high-grade medical colleges of this country or foreign countries
without examination, and in lieu of examination the board may ac-
cept certificates of registration issued by other states or foreign
countries where high standards of qualifications are required of
medical practitioners; and it may grant temporary permits to prac-
tice medicine. The exercise of these powers is discretionary. The
examination itself shall constitute a fair test of the qualifications
of the applicants in "all those topics and subjects a knowledge of
which is generally required by reputable medical colleges of the
United States for the degree of doctor of medicine." (§ 10199.)

With these powers expressly granted, there goes also a grant of
such implied powers as are necessary for the effective discharge of
all the responsible duties imposed on the defendant board. In The
State, ex rel., v. Younkin, 108 Kan. 634, 638, 196 Pac. 620, we said:

"While the powers of a public officer or board are those and those only
which the law confers, yet when the law does confer a power or prescribe a
duty to be performed or exercised by a public officer, the powers granted
and duties prescribed carry with them by necessary implication such incidents
of authority as are necessary for the effectual exercise of the powers conferred
and duties imposed." (p. 638.)

The board must ascertain as best it can what are the professional
branches of science and art taught and practiced in reputable
medical colleges. Nor is the court disposed to impose narrow re-
strictions on the defendant board in their determination of this
important matter. We think it may well mean more than getting

a mere list of the branches of learning—anatomy, physiology, hygiene, physics, chemistry, etc. It can hardly be said that the board is without power to determine the requisite thoroughness with which such sciences are studied and taught in these colleges, and it is difficult to say that the board may not inquire into the related question of the general educational requirements which medical students must possess before they can profitably enter upon the study of medicine and surgery; nor can it be denied that the state board can consult the proceedings of the American Medical Association, and its standards of professional scholarship, and that the board's opinions of Kansas requirements can be at least partially founded thereon.

It is contended by plaintiff that the statute does not require an applicant for a license to be a graduate of any medical school; that he may get his medical education wherever and however he pleases, so long as he acquires it with sufficient thoroughness to pass the examination with satisfactory grades. This contention is plausible, but it may very well be that the examining board has determined upon full and fair inquiry into all sources of information, and upon their own professional knowledge and experience, that there are important branches of medicine and surgery, like diagnosis, obstetrics, and others which cannot be mastered except by instruction and guidance under trained teachers in medical colleges having the requisite equipment therefor; and that in this day of advanced and advancing science it is altogether out of the question to license applicants to practice medicine and surgery without such efficient collegiate training, no matter how creditable a showing such applicants can make on paper in a written examination. True, this statute is twenty-one years old; it was about the first of a series of statutes by which the state has gradually expanded its governmental power over professional or semiprofessional employments; and the grants of power expressly conferred are more narrow than those granted to similar state boards of later creation. Thus, in later enactments the state board of osteopathic examiners is granted very broad powers in very short language:

"The board . . . shall formulate and adopt all necessary rules, regulations and by-laws." (§ 10207.)

The board of chiropractic examiners—

"Shall have authority . . . and shall from time to time adopt such rules and regulations as they deem proper and necessary for the performance

Jones v. Board of Medical Examination.

of their duties, and they shall adopt a schedule of minimum educational requirements, which shall be without prejudice, partiality or discrimination as to the different schools of chiropractic." (§ 10216.)

Illustrations of this sort could be greatly extended. Even the state board of embalming has been given elaborate powers to make reasonable rules touching the right of persons to practice the art of embalming. (§ 10309; *Miller v. State Board of Embalming,* 110 Kan. 135, 202 Pac. 619.)

Speaking of the powers conferred on the secretary of the state board of agriculture, this court, in *The State, ex rel., v. Mohler,* 98 Kan. 465, 158 Pac. 408, said:

"It [the act] merely confers upon him administrative power such as has become common in this state. · The state charter board is given similar power to grant or withhold a charter for a bank. (*Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80.) The insurance commissioner is authorized to grant, withhold and revoke licenses to transact insurance business in Kansas. The public utilities commission is authorized to grant or deny permits to conduct a public-service business. The state board of medical registration and examination is authorized to grant, deny or revoke licenses to practice·medicine. (*Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247.) The exercise of such power is merely the exercise of administrative discretion. If this power is abused, the courts are open to the aggrieved party, if not by some statutory review, then by the extraordinary and prerogative remedies of injunction or mandamus. And by no course of reasoning can a distinction be made between the licensing and other administrative powers conferred by this act upon the secretary of the board of agriculture and the similar broad and valid powers conferred upon the many other official boards and functionaries with which the state has provided itself for the proper and effective conduct of its governmental business." (p. 471.)

(See, also, 30 Cyc. 1550 *et seq.;* 21 R. C. L. 365, 366.).

The judgment is affirmed.

Dawson, J. (dissenting): With much that is said in the majority opinion I agree. Most of it ought to be the law, but it is not. The statutory qualifications for medical applicants read:

"All persons intending to practice medicine and surgery . . . shall apply to said board at any regular meeting, or at any other time or place as may be designated by the board for a license. Application shall be made in writing, and shall be accompanied by the fee hereinafter specified, together with the age and residence of the applicant, proof that he is of good moral character, and satisfactory evidence that he has devoted not less than three periods. of six months each, no two within the same twelve months, or if after April 1, 1902, four periods of not less than six months each, no two in the same twelve months, to the study of medicine and surgery. All such candidates, except as

hereinafter provided, shall submit to an examination of a character to test their qualifications as practitioners of medicine or surgery, and which shall embrace all those topics and subjects a knowledge of which is generally required by reputable medical colleges of the United States for the degree of doctor of medicine." (Gen. Stat. 1915, § 10199.)

The standards of the medical profession have simply run away ahead of the statute. The statute is twenty-one years old and ought to be brought up to date; but that is the concern of the legislature, not of the judiciary.

> "We — don't — make — law.  We are bound
>     To interpret it as found."

(Ironquill's note to *The State v. Lewis,* 19 Kan. 260, 266.)

Furthermore, even the legislature itself cannot constitutionally abdicate its legislative functions and shift its responsibility to grade and classify colleges upon an unofficial "American Medical Association" which is not and cannot be subjected to the governmental control of this state. Nor can it authorize a state board of its creation to do so. In *The State v. Crawford,* 104 Kan. 141, 143, 144, 177 Pac. 360, where the powers of the legislature to delegate authority to official boards to make rules and regulations was considered, it was said:

"But none of the cases cited has ventured so far afield as to intimate that the legislature might delegate to some unofficial organization of private persons, like the National Fire Protective Association, the power to promulgate rules for the government of the people of this state or for the management of their property, or that the legislature might prescribe punishment for breaches of these rules. We feel certain that no such judicial doctrine has ever been announced. If assent to such a doctrine could be given, a situation would arise where owners of property with considerable persistence might learn what these code rules were and incur the expense of making their property conform thereto, only to find that the National Fire Protective Association had reconvened in Chicago, New York, or New Orleans, and has revised the code, and that the work and expense had to be undertaken anew. . . . Shall it be intimated that if these fire prevention regulations, these 'national electrical code' rules, are oppressive, or otherwise objectionable, the property owners of this state must be referred to some voluntary and unofficial conference of underwriters and electricians, which occasionally meets here, there, or anywhere in North America, for redress of grievances?"

How would our writ of mandamus reach the "American Medical Association" to compel it to give a square deal to the medical colleges which are attended in good faith by our young people and whose courses they have faithfully pursued to completion? Was the plain-

Jones v. Board of Medical Examination.

tiff guilty of negligence in the selection of his *alma mater*, The Kansas City College of Medicine and Surgery? Can it be said that he knew or should have known that that institution was *persona non grata* with the "American Medical Association"? And must this plaintiff, before he can practice his chosen profession in his native state, and regardless of his professional college training and his ability to pass the requisite examination, commence afresh in some "Class 'A' college" to learn the names of the bones in the human body and the meaning of *cibus, aqua,* $H_2O$, etc., before he can hope to practice in Kansas?

I dissent.

WEST, J. (dissenting): The only authority resting in the board is found in the words "it shall have a common seal, and shall formulate rules to govern its actions." But its actions so far as involved here had already been expressly ordered, directed and prescribed by a power even higher than itself—the legislature. For when the act was passed in 1901 it was provided that—

"All such candidates except as hereinafter provided, shall submit to an examination of a character to test their qualifications as practitioners of medicine or surgery, and which shall embrace all those topics and subjects a knowledge of which is generally required by reputable medical colleges of the United States for the degree of doctor of medicine; . . ." (Gen. Stat. 1915, § 10199.)

This is perfectly plain. When an applicant presents himself it is the duty of the board in its examination to test his qualifications in the subjects required by the schools indicated. No matter how high a grade any such school may possess the board need not take its say so as to the applicant's qualifications. And no matter how distasteful to any member of the board such a school may be it is none the less the board's duty to test the applicant's qualifications in the subjects thus unmistakably pointed out by the legislature. And yet it is stipulated that—

"After taking a part of said examination Dr. C. F. Menninger, a member of the board notified this plaintiff that he could not further proceed with the examination, and refused to let him further proceed with said examination and *gave as his sole and only reason therefor* that the applicant had studied medicine a part of the time at the Kansas City College of Medicine and Surgery at Kansas City, Missouri, which the board did not recognize."

That is to say, there is no pretense that the plaintiff is not fully and completely qualified in all respects as the statute prescribes and requires, but because the board had not seen fit to recognize a cer-

tain medical college, therefore—not that it will not issue the appli-
cant a diploma—it will not even examine him. The consequence is
that this action or whim of a mere ministerial board with clearly de-
fined and limited powers serves as a repeal of the statute passed by
the legislature and as an *impasse* to one who may be in all respects
fully entitled to admission.

Whenever those who make the law see fit to change it there will
be time for those whose duty it is to obey it to interpose the excuse
now put forward. As was well said by Mr. Justice Johnston in *The
State v. Wilcox,* 64 Kan. 789, 68 Pac. 634, in speaking of the board:

"It is vested with discretion to determine the standing of medical schools
from which the diploma comes, and also whether a physician who submits to
an examination possesses the requisite character, learning, and skill, but it is
not an arbitrary, capricious and unrestrained discretion." (p. 792.)

It was held in *Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247,
that—

"The state [not some board] . . . may prescribe the qualifications of
persons desiring to practice medicine. . . ." (Syl. ¶ 1.)

In the opinion, Mr. Justice Greene said:

"The board . . . is not a judicial tribunal. While it may be said to act
*quasi*-judicially, it is only a ministerial board and performs no judicial func-
tions." (p. 715.)

I think the writ should issue.